**PORTER COUNTY CHAPTER OF the IZAAK WALTON LEAGUE OF AMERICA, INC., et al., Plaintiffs,**

v.

**UNITED STATES ATOMIC ENERGY COMMISSION and United States of America, Defendants.**

**Civ. A. No. 72 H 251.**

United States District Court, N. D. Indiana, Hammond Division.

Aug. 13, 1974.

J. B. Smith, Hammond, Ind., Edward W. Osann, Jr., Chicago, Ill., for plaintiffs.

Leon Silverstrom, U. S. Atomic Energy Commission, Washington, D. C., William H. Eichhorn, Hammond, Ind., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALLEN SHARP, District Judge.

### I. *Background*

1. On October 6, 1972, plaintiffs instituted this action to compel production of various agency records pursuant to the Freedom of Information Act, 5 U.S.C. § 552. The complaint charged the Atomic Energy Commission (AEC) with not making available various documents which plaintiffs allegedly needed in connection with an AEC licensing proceeding involving an application of the Northern Indiana Public Service Company for a permit authorizing construction of a nuclear plant in Porter County, Indiana. Plaintiffs had intervened in that proceeding and were opposed to the issuance of a construction permit.[1] Plaintiffs requested a Court order directing release of the records and a temporary injunction deferring a hearing in the licensing proceeding pending the Court's consideration of the merits of the complaint.

2. On October 10, 1972, the Court denied plaintiffs' request for a temporary restraining order against the start of the administrative hearing, primarily on the ground that plaintiffs had not demonstrated they would suffer irreparable injury if the hearing began as scheduled. The Court postponed for subsequent consideration the merits of plaintiffs' Freedom of Information Act claims relating to withheld documents.

3. On March 16, 1973, plaintiffs filed a motion to compel production of withheld documents for *in camera* inspection. Defendants opposed that motion and moved for dismissal of this action pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment pursuant to Rule 56. Accompanying defendants' motion was an affidavit of Mr. Lee V. Gossick, Assistant Director of Regulation of the Atomic Energy Commission, dated March 30, 1973, and an affidavit of Mr. Raymond F. Fraley, Executive Secretary of the Advisory Committee on Reactor Safeguards (ACRS), dated March 30, 1973. These affidavits discussed the documents requested by plaintiffs, the records produced in response to plaintiffs' request, the documents, or portions of documents, withheld from production, and the reasons for withholding. As explained in a subsequent affidavit of Mr. Fraley, dated December 21, 1973, defendants subsequently furnished plaintiffs various additional materials, or portions thereof.

4. On December 27, 1973, the Court heard oral argument on the aforesaid motions, and determined *inter alia* that (Order dated December 28, 1973):

   a. The Government's Motion would be treated as a Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure;

---

1. In response to plaintiffs' document request, the AEC produced over 11,500 pages of records.

b. All parties would have until January 31, 1974, to file any supplemental material they wished to bring to the Court's attention in regard to the said Motion for Summary Judgment; and

c. The Government should submit, by January 31, 1974, all requested materials and documents remaining in dispute, for *in camera* inspection by the Court.

5. Pursuant to paragraph "b" of the Court's decision, plaintiffs for the first time responded to the Government's Motion, on January 31, 1974. The Government submitted the records in dispute for the Court's *in camera* review by letter dated January 25, 1974.

## II. *Documents In Issue*

6. Plaintiffs' document request included essentially all internal records of the AEC and of the Advisory Committee on Reactor Safeguards (ACRS), concerning the proposed "Bailly" nuclear power plant, as well as assorted documents on various related reactors. (Gossick affidavit, par. 7; Fraley affidavit, par. 7).

7. As stated, the Government furnished plaintiffs over 11,500 pages of records in response to this request, despite its expressed belief that much of the material was exempt from mandatory disclosure under the exemption provisions of the Freedom of Information Act, 5 U.S.C. § 552(b). The Government objected to disclosure of two categories of documents, which it withheld *in toto*; in addition, the Government made certain deletions from the 11,500 released pages. The categories of documents withheld are:

a. Various papers containing legal advice, prepared by counsel for the AEC's Regulatory Staff (seven pages);

b. Assorted generally untitled, undated and uncirculated handwritten personal notes of AEC and Argonne National Laboratory personnel (about 90 pages).

The Government contended that these documents were exempt from mandatory production pursuant to exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5).

With reference to the deletions made in produced documents, the Government contended that the deleted material was exempt pursuant to exemptions 4 and 5 of the Act, 5 U.S.C. §§ 552(b)(4), 552(b)(5). Both the records withheld *in toto* and the deletions in produced documents were discussed and explained in the aforementioned Government affidavits. All withheld documents, together with copies of all portions of documents deleted from materials provided to plaintiffs, were submitted to and reviewed by the Court *in camera*.

## A. *Legal Advice Prepared By Counsel*

8. In the course of its extensive review of any construction permit application, the AEC's Regulatory Staff often must rely on the advice of counsel. For example, counsel needs to evaluate the legal adequacy of many documents submitted by an applicant or prepared by the Regulatory Staff, such as Environmental Statements prepared pursuant to the National Environmental Policy Act, 42 U.S.C. § 4332, or Safety Evaluations prepared pursuant to the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*[2] Questions on matters such as the Freedom of Information Act and AEC discovery practices also arise. While much of this advice is presented orally, written communication is frequently necessary. In the present case, seven pages of such legal advice were included within the records requested by plaintiffs.

---

2. Counsel's advice and recommendations in this case with respect to the staff's draft environmental statement are repeated in a subsequent note from Mr. James Henry, Projects Manager, to Mr. A. Giambusso, Deputy Director for Reactor Projects.

While this note was furnished to plaintiffs, the lawyers' advice and recommendations were deleted. The Court's findings and conclusions concerning counsel's advice apply equally to the deleted material in this note.

9. On the basis of its review of the documents in issue, as well as the affidavit of Mr. Gossick and the complete record in this case, the Court finds that disclosure of lawyers' advice to clients, and the precedent which such disclosure might present, would severely impede lawyer-client communications within a governmental agency. Materials containing such advice, such as the records here in issue, would not be available by discovery in ordinary litigation.

**B. Uncirculated Handwritten Personal Notes**

10. In executing their responsibilities relating to the AEC's health and safety and environmental reviews, individual AEC staff members frequently prepare assorted handwritten materials for their own use. Such materials are not circulated to nor used by anyone other than the authors, and are discarded or retained at the author's sole discretion for their own individual purposes in their own personal files. The AEC does not in any way consider such documents to be "agency records," nor is there any indication in the record that anyone other than the author exercises any control over such documents.

11. On the basis of its review of the documents in issue, as well as the Gossick affidavit and the entire record in this case, the Court finds that these materials are personal notes, rather than agency records. Disclosure of such personal documents would invade the privacy of and impede the working habits of individual staff members; it would preclude employees from ever committing any thoughts to writing which the author is unprepared, for whatever reason, to disseminate publicly. Even if the records were "agency records," their disclosure would be akin to revealing the opinions, advice, recommendations and detailed mental processes of government officials. Such notes would not be available by discovery in ordinary litigation.

**C. Deleted Material In Produced Documents**

12. As noted in paragraph 7, above, various deletions were made on about fifty of the approximately 11,500 pages furnished to plaintiffs. These deletions were contained in documents of the Commission's Regulatory Staff and in documents of the aforementioned Advisory Committee on Reactor Safeguards. In Regulatory Staff documents, two types of information were deleted: a) confidential commercial information, and b) staff opinions, recommendations and advice. No confidential commercial information was identified in the requested documents of the ACRS, and only opinions, recommendations, and advice of individuals, and other material inextricably intertwined with this advisory committee's decisionmaking processes, were deleted from ACRS materials.

**1. Confidential Commercial Information**

13. In connection with its responsibilities to protect the public health and safety, the AEC requires all applicants for a construction permit to file an extensive application, generally consisting of several volumes. This application is extensively reviewed by the AEC Regulatory Staff and the Advisory Committee on Reactor Safeguards. Both in this original application and in the course of subsequent correspondence and discussions during the staff's review, a great deal of technical, commercial, and financial information is submitted by the applicant, the manufacturer of the proposed facility, or suppliers of specific components. While most of this information is made public, together with most other material relating to an application, some constitutes privileged commercial or financial information, whose disclosure would cause substantial harm to the competitive position of the submitting company, and is supplied by the company only pursuant to an understanding that it will be kept confidential. (The parties referred to such material as "proprietary.")

14. About fourteen pages of disputed material were deleted, in whole or in part, because the information was found to be "proprietary." Most of these

pages, essentially all in chart form, related to the Bailly plant "Off-Gas System," to be built by the General Electric Company; in addition, part of one AEC inspector's report was deleted because it contained a complete listing of all reactor pressure vessels then in fabrication by Combustion Engineering, Inc., including estimated delivery dates. Defendants submitted to this Court letters received by AEC from each of these companies, as well as from counsel for Northern Indiana Public Service Company, asserting that the information was proprietary and requesting continued confidential treatment thereof. The letters had previously been supplied to plaintiffs in connection with their role in the AEC licensing proceedings on the Bailly plant. In this Court, plaintiffs did not challenge any of the statements made in any of the letters.

15. Defendants did not automatically accept the companies' assertions that the information was proprietary. Each assertion was reviewed by the AEC staff, which determined that the assertion was made in accordance with normal company procedures having a rational basis, and that the information involved is in fact customarily held in confidence and is not customarily made available to the public. The Staff experts further concluded that each claim was not unreasonable, and that the information should be accorded protection. (Gossick affidavit, paras. 12, 17). On the basis of the entire record—and with no evidence to the contrary—this Court accepts the defendants' determinations with respect to the proprietary information.

16. Defendants stated, and plaintiffs did not disagree, that plaintiffs, as parties to the AEC licensing proceeding, could have received access to the "proprietary" information in issue pursuant to an appropriate protective arrangement prohibiting further dissemination. (Gossick affidavit, para. 13). Thus, at stake here was not plaintiffs' own access to the information, but rather whether the Government must make the material publicly available, without any restrictions whatsoever. In addition to what has already been said, the Court believes that unrestricted release of such private commercial information would tend to adversely affect the Government's own ability to gain access to similar information in the future. Ultimately, such release could seriously affect the thoroughness of AEC review of license applications, and have an adverse impact on public health and safety.

17. The remaining proprietary information here at issue consisted of detailed plant security information; specifically, information concerning various nuclear reactor licensees' control and accounting procedures for safeguarding licensed nuclear material, or detailed measures for the physical security of a licensed facility. The Court agrees, and no contrary evidence was suggested, that "release of such information could facilitate attempts at sabotage, diversion of nuclear material, or other attacks upon nuclear power facilities, to the obvious detriment of public health and safety." (Gossick affidavit, par. 18).

## 2. *Opinions And Recommendations Of Individual Staff Members*

18. As stated above (par. 8, fn. 2), the lawyers' opinions and advice in issue in part were summarized in a note from a Regulatory Staff official to his supervisor. This summary was deleted from the note before that document was released. In addition, three other brief passages were deleted from the thousands of Regulatory Staff pages produced. Each of these passages was clearly an opinion or recommendation of the individual author. Both the documents and Mr. Gossick's affidavit establish that these opinions or recommendations were all part of the agency's deliberative, policy-making, and decisional processes involved in executing its important health, safety, and environmental responsibilities.

19. In conducting a thorough review, it is essential that Staff members be able freely to communicate with each other. Disclosure of internal communi-

cations such as were here deleted can hamper the candid exchange of views and the ultimate policy-making process. Such opinions and recommendations would not be available by discovery in ordinary litigation.

### 3. *Deletions In Documents Of The Advisory Committee On Reactor Safeguards (ACRS)*

20. The ACRS was established in 1957 by Congress with specific safety review and advisory functions, to assure "that any features of new reactors would be as safe as possible." (H.R. Rep.No.435, 85th Cong., 1st Sess. at 24). The Act requires the Committee to "review safety studies and facility license applications referred to it and . . . make reports thereon. . . . advise the Commission with regard to the hazards of proposed or existing reactor facilities and the adequacy of proposed reactor safety standards, and . . . perform such other duties as the Commission may request." (42 U.S.C. § 2039)

21. The Committee is authorized a maximum of 15 members appointed by the Atomic Energy Commission for terms of 4 years each. All members are scientists or engineers who are eminently qualified in various fields needed to conduct a nuclear safety review. Insofar as is relevant here, the Committee's primary objective with respect to any nuclear license application is to issue the collective report to the AEC required by the Atomic Energy Act. It accomplishes this task by initially appointing a subcommittee, generally consisting of 4 or 5 ACRS members, for each application. The subcommittee is used to insure that sufficient information is developed for a full ACRS decision and that any new or novel aspects of a proposed reactor design warranting special consideration are identified. The subcommittee membership is supplemented by consultants in those areas where a special problem or novel aspect of the reactor design requires particular expert knowledge. On the basis of the subcommittees' ground-

work, the full Committee meets to discuss the application and formulate a report to the AEC. The report itself becomes a part of the public record concerning the license application in issue.

22. The Committee's report is always a collegial document, reflecting the collective view of the Committee as a whole. In cases where members wish to express reservations to the majority view, separate views of individual members are appended to the report. It was the Committee's strongly expressed view that "its effectiveness—indeed, the ability to carry out its advisory function—is in large measure based on two factors: its substantial independence in giving safety advice, and the ability to carry out its collegial operation on a confidential basis where necessary." (Fraley affidavit, par. 6). To assure fully informed decisionmaking and proper assessment of all relevant safety considerations in the important area of nuclear power, it is important that this view be accommodated insofar as permitted by law.

23. The ACRS withheld no records *in toto* in response to plaintiffs' broad document request. On various released materials, however, the Committee deleted certain passages, containing personal opinions, recommendations, or advice of individual Committee members or staff members, or other material directly reflecting the Committee's deliberations in evaluating the Bailly plant application. In addition to minutes of meetings of the ACRS and its subcommittees, the materials containing deletions were all generated as part of the Committee's decisionmaking processes relating to the issuance of a report on the Bailly application. (For example, the Committee deleted from its "Background Memorandum" material summarizing how and why the Committee's final report came to include particular conclusions.)

24. Disclosure of such deleted material would impede free and candid Committee consideration of an application, with potential adverse effect on public health and safety. Especially in view of

the difficulty of distinguishing between "purely factual," and advisory or deliberative material, it is noteworthy how little was deleted by the Advisory Committee before the records were released. In this connection, Mr. Gossick's affidavit concerning Regulatory Staff records applies equally well to the Committee's deletions: " . . . the marshalling and highlighting of factual material is itself often a reflection of personal opinion and advice. In combining, emphasizing and discussing certain facts while omitting or minimizing others, individual staff members in essence are expressing their own personal views concerning the relative importance of these facts— views which may or may not be shared by other persons involved in the overall decisionmaking process." (Gossick affidavit, par. 15). The material deleted would not be available by discovery in ordinary litigation.

25. As already noted, the Court considered the complete record, including the disputed records themselves in reaching its conclusions in this case. In expounding on its findings, the Court finds it unnecessary to discuss each particular deletion in every contested document. The findings expressed for groups of documents apply equally to the particular deletions in that group. Finally, none of the documents can be further divided to meaningfully produce additional material, without endangering the confidentiality of the properly withheld information.

### III. *Conclusions Of Law*

1. The Freedom of Information Act (FOIA), 5 U.S.C. § 552, is a broadly conceived statute which seeks to permit public access to much previously-withheld official information. Subsection (b) of the statute, containing specific categories of records exempt from the Act's mandatory disclosure provisions, "is part of this scheme and represents the congressional determination of the types of information that the Executive Branch must have the option to keep confidential, if it so chooses." EPA v.

Mink, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). The records and portions of records withheld in this case clearly fall within exemptions 4 and 5 of the Act.

### *Exemption 4*

2. Exemption 4 of the Act, 5 U.S.C. § 552(b)(4), exempts all

"trade secrets and commercial or financial information obtained from a person and privileged or confidential".

The Senate Report on the Act describes the purpose of this section as follows:

"This exception is necessary to protect the confidentiality of information which is obtained by the Government through questionnaires or other inquiries, but which would customarily not be released to the public by the person from whom it was obtained. This would include business sales statistics, inventories, customer lists, and manufacturing processes. * * * "

S.Rep.No.813, 89th Cong., 2d Sess. 9 (1964). The House Report adds:

"It would also include information which is given to an agency in confidence, since a citizen must be able to confide in his Government. Moreover, where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations." H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1964).

█ 3. The exemption "has a dual purpose. It is intended to protect interests of both the Government and the individual [supplying the information]." National Parks and Conservation Assoc. v. Morton, 498 F.2d 765, 767 (D.C. Cir. 1974). It covers information which is "(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential. Getman v. NLRB, 146 U.S.App.D.C. 209, 450 F.2d 670, 673 (1971), quoting Consumers Union of United States, Inc. v. Veterans Administration, 301 F.Supp. 796, 802 (S.D.N.Y. 1969), appeal dismissed, 436 F.2d 1363 (2d Cir. 1971)." *Id.*, at p. 766. *See*

*also* Sterling Drug, Inc. v. FTC, 146 U. S.App.D.C. 237, 450 F.2d 698, 709 (1971).

■ 4. Applying these criteria, the Government's deletions in this case pursuant to exemption 4 were clearly appropriate. (Findings of Fact 13–17). Indeed, the AEC took special efforts to assure that private claims that information is "proprietary" were properly justified and reviewed, 10 C.F.R. 2.790(b), and that even properly privileged information could be made available to persons having an appropriate need therefor. (Finding of Fact 16).

### Exemption 5

5. Exemption 5 of the Act, 5 U.S.C. § 552(b)(5), exempts all

"inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

6. The Courts have recognized that: "the Congress intended that Exemption (5) was to reflect the privilege, customarily enjoyed by the Government in its litigations, against having to reveal those internal working papers in which opinions are expressed and policies formulated and recommended.

The basis of Exemption (5), as of the privilege which antedated it, is the free and uninhibited exchange and communication of opinions, ideas, and points of view—a process as essential to the wise functioning of a big government as it is to any organized human effort. In the Federal Establishment, as in General Motors or any other hierarchical giant, there are enough incentives as it is for playing it safe and listing with the wind; Congress clearly did not propose to add to them the threat of cross-examination in a public tribunal." Ackerly

v. Ley, 137 U.S.App.D.C. 133, 420 F. 2d 1336, 1341 (1969).

See also EPA v. Mink, *supra*; Freeman v. Seligson, 132 U.S.App.D.C. 56, 405 F.2d 1326, 1339 (1968) [5 U.S.C. § 552(b)(5) was enacted as "a clear expression of congressional policy to hold the line on disclosure of materials of this sort."]; International Paper Company v. FPC, 438 F.2d 1349, 1355 (2d Cir. 1971).

■ 7. The documents and portions of documents here in issue—lawyers' advice, opinions and recommendations of individual staff members, opinions of ACRS members, summaries of the internal deliberations of the Committee, etc.—are clearly an integral part of the Government's deliberative processes. Such documents "would not be available by law to a party other than an agency in litigation with the agency." [3] Accordingly, they are clearly within the scope of exemption 5.

8. Minutes of meetings of the ACRS have already been considered under the FOIA by the Seventh Circuit, as well as by the United States District Court for the Northern District of Illinois. Comey et al. v. AEC et al., D.C.N.D.Ill., Civ. No. 72 C 1744; on appeal, 7th Cir., 481 F.2d 1407. While not reaching the question of whether ACRS minutes are *per se* exempt from disclosure, the Court of Appeals reviewed forty pages of such minutes which had been released with deletions, as in this case. Except for two brief deletions, the Court specifically concluded that "the parts excised by the government from the forty pages were properly found by the district court to be within exemption 5." (unreported slip opinion, p. 6, July 27, 1973, see 481 F.2d 1407 (1973); see also July 10, 1973 District Court order in same case, not appealed, holding that deletions in other ACRS records such as are here in issue are exempt from production pursuant to exemption 5.)

3. With respect to the uncirculated handwritten notes discussed in paragraphs 10 and 11, *supra*, the Court separately and in addition concludes they are not "agency records" within the scope of 5 U.S.C. 552(a)(3).

### IV. *Conclusion*

On the basis of the foregoing Findings of Fact and Conclusions of Law, and the record demonstrating that there is no genuine issue as to any material fact and that the Government is entitled to judgment as a matter of law, the Government's motion for summary judgment is granted. An appropriate order was entered on June 26, 1974.