UNITED STATES of America, Plaintiff,

v.

Harvey S. GOLD, Charles J. Calo, John C. Tapas, Kenneth L. Schulz, Neil R. Mitchell, Bernard H. Lorant, and Velsicol Chemical Corporation, Defendants.

No. 77 CR 1073.

United States District Court,
N. D. Illinois, E. D.

April 20, 1979.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for plaintiff.

Williams & Connolly, Edward Bennett Williams, Vincent J. Fuller, Washington, D. C., Donald J. McLachlan, Isham, Lincoln & Beale, Chicago, Ill., Lipnick, Barsy & Joseph, Herbert Barsy, Chicago, Ill., A. E. Botti, Wheaton, Ill., Walsh, Case & Coale, Ralph Brown, Chicago, Ill., George J. Cotsirilos & Associates, Inc., George J. Cotsirilos, Chicago, Ill., Jenner & Block, Donald R. Harris, Laura A. Kaster, Chicago, Ill., Wildman, Harrold, Allen & Dixon, Bernard Harrold, Douglas Carlson, Chicago, Ill., for defendants.

## MEMORANDUM

LEIGHTON, District Judge.

In this criminal prosecution, an eleven-count indictment charges six individuals and a corporation, all in one count and all or some in other counts, with conspiracy to make, and with having made fraudulent statements, false representations to, and having concealed material matters from a governmental agency; and with violations of the Mail Fraud Act. Defendants have jointly filed 47 pretrial motions, 14 of them directed against the indictment because of alleged defects of form and substance.

In one motion to dismiss, supported by memoranda, exhibits and affidavits, defendants alleged that the grand jury which returned this indictment had an unauthorized person in the grand jury room. They allege that while Bingham Kennedy acted as a Special Attorney for the Department

of Justice presenting the government's case to the grand jury, he was at the same time on the staff of the Environmental Protection Agency, the complaining party in the criminal charges being investigated; that he was in the employ of the agency, and represented it in administrative proceedings in which the corporate defendant was a party; and that he became an important witness who alternated his position from that of a prosecutor to that of a person who testified and furnished evidence on which the grand jury returned the indictment in this case. These serious allegations, and the nature of the government's response to them, led this court to conclude that an evidentiary hearing was required. Accordingly, a hearing has been had at which witnesses have testified and a large number of exhibits have been offered and received.[1] The issue that arises is whether the evidence adduced requires dismissal of this indictment.

## I.

### A.

Velsicol Chemical Corporation is engaged in the production, distribution, and sale of various pesticide chemicals, including heptachlor and chlordane, of which in this country it is the sole manufacturer. The national distribution, sale, and use of pesticide chemicals is regulated by the United States Environmental Protection Agency that functions pursuant to certain federal laws. The most important of these are the Federal Insecticide, Fungicide, and Rodenticide Act, amended in October 1972, 7 U.S.C. § 136, *et seq.*, and §§ 408, 409 of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 346a, 348.[2] A pesticide chemical cannot

be manufactured, distributed or sold within the United States without being registered with the Administrator of EPA upon compliance with the requirements of FIFRA. The same statute governs the cancellation and suspension of registered pesticide chemicals; and in section 6(a)(2), it is provided that "[i]f at any time after the registration of a pesticide the registrant has additional factual information regarding unreasonable adverse effects on the environment of the pesticide, he shall submit such information to the Administrator." 7 U.S.C. § 136d(a)(2). Sections 408 and 409 of the Federal Food, Drug and Cosmetic Act regulate the tolerance that is permitted in the use of a pesticide chemical, in or on a raw agricultural commodity. These provisions require that a petitioner for the tolerance established by the Administrator of EPA furnish data, including reports of investigations made with respect to the safety of a pesticide chemical. 21 U.S.C. § 346a(d)(1)(C). A petition for a food additive tolerance must "contain full reports of investigations made with respect to the safety for use of such additive, including full information as to the methods and controls used in conducting such investigations." 21 U.S.C. § 348(b)(2)(E).

In 1971, in fact for a long time before and throughout the period alleged in this indictment, heptachlor and chlordane were registered by the Administrator of EPA for distribution and sale in the United States. Defendants Harvey S. Gold, Charles J. Calo, John C. Tapas, Kenneth L. Schulz, and Neil R. Mitchell were Velsicol executives, all of them acquainted with and having varying degrees of responsibilities for the corporation's compliance with the regulatory requirements of FIFRA as they pertain to the

1. In addition to the motion to dismiss because of an unauthorized person in the grand jury room, defendants presented evidence in support of five other motions concerning which there were questions of fact to be resolved. By a minute order, the court has provided that two of these motions will be treated as being included in defendants' motion to dismiss because of

the totality of grand jury abuse by the prosecution.
2. In these days when acronyms form a mode of expression, this court, consistent with current use, will hereafter refer to the Environmental Protection Agency as EPA and to the Federal Insecticide, Fungicide, and Rodenticide Act as FIFRA.

registration of heptachlor and chlordane. Defendant Bernard H. Lorant, during the same time, was a Velsicol attorney similarly involved.

Sometime in June 1971, at EPA's suggestion and in order to answer questions concerning whether heptachlor was tumorigenic or carcinogenic in man or laboratory animals, Velsicol entered into an agreement with the International Research and Development Corporation of Mattawan, Michigan[3] for the administration of an 18 month feeding study in mice using a mixture of heptachlor and hetachlor epoxide, a metabolite of heptachlor. Later that year, in December 1971, Velsicol again contracted with IRDC for the administration of a similar 18 month feeding study in mice for chlordane. Slides from some two thousand animals were involved in the studies. IRDC made reports; and thereafter, between December 1972 and January 1973, Velsicol retained two consulting pathologists, Dr. John Rust of the University of Chicago and Dr. Paul Newberne of the Massachusetts Institute of Technology, to examine slides of liver tissues from mice used in the heptachlor and chlordane studies. In a report to Velsicol dated December 29, 1972, Dr. Rust, from a review of 50 IRDC slides, concluded "it is quite clear that the test animals were subjected to a severe hepatoxin and carcinogen." In a report completed at approximately the same time, Dr. Newberne found among 22 IRDC slides he examined "liver cell carcinomas."[4]

On October 15, 1973, in the course of an administrative proceeding, Velsicol submitted to EPA a copy of IRDC's final report concerning the feeding study of mice in which heptachlor had been used. This "show[ed] a compound-related incidence of nodular hyperplasia of the liver but no induction of cancer." In the same month that this report was given to EPA, Velsicol employed Dr. William MacDonald of the University of Miami in Coral Gables, Florida, a consulting toxicologist, to examine for tumorigenicity all of the IRDC slides from the carcinogenicity study of heptachlor. In September 1974, Dr. MacDonald's employment was extended to include an examination for tumorigenicity of all IRDC slides from the carcinogenicity study of chlordane. IRDC's final report of its carcinogenicity study on chlordane was received by Velsicol during the month of December 1973. In the months of June and October 1974, Dr. MacDonald reported to Velsicol that many of the IRDC slides from mice that had been fed heptachlor showed tumors or pre-tumorous lesions; during January 1975, he reported that many of the slides from mice fed chlordane showed tumors or pre-tumorous lesions, and that both heptachlor and chlordane were liver tumorigens. Velsicol did not give EPA any of the Rust-Newberne-MacDonald reports.

Sometime during the month of February 1975, William E. Reukauf, lead EPA counsel in the administrative proceedings to cancel the registration of heptachlor and chlordane that had been pending since November 1974, had a conversation with a government consultant who suggested that Velsicol be asked whether other pathologists had examined some of the IRDC slides. Reukauf immediately wrote to Velsicol's lawyers and inquired. Then, an exchange of letters informed Reukauf of the fact that Drs. Rust, Newberne, and MacDonald had

---

3. Because of the frequency with which this laboratory will be mentioned in the balance of this memorandum, it will be referred to hereafter as IRDC.

4. Throughout this controversy with EPA, Velsicol and the other defendants have contended that they were under no obligation to send the Rust-Newberne-MacDonald reports to the Administrator because of the thousands of mice IRDC had used in the 18 month feeding study, the three scientists had examined only a few. Their reports were not factual or reliable. Defendants rely on the express language of FIFRA, section 6(a)(2), 7 U.S.C. § 136, *et seq.*, which requires submission to the Administrator only of "additional *factual* information regarding *unreasonable* adverse effects on the environment of the pesticide . . . ." [Emphasis added.]

made such examinations; and on June 10, 1975 he was sent copies of the Rust-Newberne reports with the promise he would be furnished with a copy of the one made by Dr. MacDonald. Two days later, Reukauf sent a memorandum to the general counsel of EPA informing him of the discovery that other pathologists had looked at selected slides from the IRDC study and had furnished Velsicol with data adverse to the continued registration of heptachlor and chlordane. Reukauf, without having made any other inquiry or investigation, expressed the view "that Velsicol has violated section 6(a)(2) of FIFRA if they did not inform the Agency of these data." He quoted the words of the section and said, "I believe we should consider utilizing the criminal sanctions provided for in FIFRA. (Sec. 14(b)(1).)" A month later, expanding on Reukauf's memorandum, but also without any further inquiry or investigation, the General Counsel of EPA referred the matter to the Department of Justice recommending criminal prosecution of "[Velsicol] and its appropriate officers and employees" for the violations of FIFRA which he believed occurred when the data contained in the Rust-Newberne-MacDonald reports was not submitted to the Administrator of EPA.

### B.

At the time of this referral, Bingham Kennedy was a lawyer on the General Counsel's staff. He joined the agency on March 13, 1975, and from then throughout the grand jury investigation of this case, he was in touch with the administrative proceedings in which EPA was seeking cancellation or interim suspension of the registrations of heptachlor and chlordane. At issue in those proceedings, in fact central in them, was the alleged carcinogenicity or tumorigenicity of the two pesticides. The lawyers who there represented EPA were

Kennedy's immediate superiors in the Pesticide Division, with an associate of his as lead counsel. Then early in February 1976, there were three important resignations from the General Counsel's staff; therefore, Kennedy temporarily filled the position of Deputy Associate General Counsel for administrative litigation. In that capacity he supervised attorneys for the Pesticide Division then handling the heptachlor/chlordane case.

On August 22, 1975, Kennedy was relieved of all responsibilities in the administrative proceedings and assigned to work on the Velsicol criminal referral. He was told that the agency was dissatisfied with the pace at which the Department of Justice was proceeding with the matter, and that his superiors desired that an indictment against Velsicol and its appropriate employees be expeditiously obtained. Kennedy immediately dropped all other agency work, and between August 22 and 29, without any further investigation and with limited knowledge of the factual and legal matters involved, prepared drafts of an indictment. With the exception of a change in legal theory, and the upgrading of misdemeanor charges to felony accusations, the indictment drafts prepared by Kennedy were similar to the indictment returned in this case. After receiving approval of the Department of Justice and in order to expedite transfer of the case to this district, Kennedy travelled by plane to Chicago and delivered the department's referral letter and proposed form of indictments to the first Assistant United States Attorney in this district who docketed the matter, naming Kennedy as the case agent. On September 19, 1975, after he was sworn as a witness and a grand jury agent, Kennedy, at the request of the EPA,[5] was appointed a Special Attorney in the United States Department of Justice in order that he could

---

**5.** Defendants have obtained from the government an unsigned memorandum written, apparently, on September 19, 1975 by which the request for Bingham Kennedy's appointment as a Special Attorney was made. In a final paragraph it is stated that the United States Attorney had made the request "believing that Mr. Kennedy's expertise with respect to many highly technical matters will be of assistance to the grand jury in its investigation. The United

participate as a prosecutor in the Velsicol criminal investigation in this district. His EPA superiors considered his assignment to the investigation a significant manpower sacrifice by the Pesticide Division; they agreed that his participation as a lawyer from the agency was indispensable; the lead counsel in the administrative proceedings against Velsicol viewed Kennedy as the EPA contact with the Department of Justice in the criminal investigation that produced the indictment in this case.

Throughout the time he served as this contact, Kennedy remained an EPA staff attorney. He was paid by the agency; his professional advancement and non-automatic salary increases depended on evaluations he received from his superiors, the officials who made the criminal referral and who were conducting administrative proceedings against Velsicol. His travel expenses between Chicago and the District of Columbia as a Special Attorney for the Department of Justice in the grand jury investigation were borne by EPA, approved by his superiors in the Office of the General Counsel. He continued to maintain an office in the EPA headquarters in the District of Columbia. He frequently transported grand jury documents from Chicago to review in the office he occupied within the Pesticide Division, immediately adjacent to those used by attorneys who were handling the administrative proceedings against Velsicol. He shared secretarial services with one of the attorneys involved in the administrative case. The volume of documents he sometimes took to EPA headquarters was so great that he was required to move them in cartons. At no time did any responsible EPA official issue any order or memorandum that isolated Kennedy from the other staff lawyers in the Office of the General Counsel. During the same period, he served as a member of a working group created by EPA, and represented EPA at a

meeting that concerned a contract between the agency and the National Academy of Sciences, a contract related to an administrative proceeding against Velsicol and concerning heptachlor/chlordane; he represented the agency at a meeting with representatives of the National Agricultural Chemicals Association at which was discussed the meaning of a regulation promulgated by EPA under section 6(a)(2) of FIFRA, the section of the statute involved in this case. The Department of Justice considered the financial arrangement between Kennedy and his agency an appropriate one because in its opinion "Mr. Kennedy's activities in support of the United States Attorney have been concerned strictly with the interests of EPA."

### C.

Kennedy first worked with the regular September 1975 Grand Jury; and then with the special one that began meeting in June 1976 to investigate this case, and which returned the indictment now at issue. He appeared as a prosecutor before the latter grand jury on 30 to 40 of the 47 days it met. At times, he was the only government attorney with the grand jurors in the grand jury room. As a Special Attorney for the Department of Justice, Kennedy participated in the examination of a majority of the witnesses who testified. On some occasions, he alone examined the witnesses; and on others, he assisted Mr. Robert L. Herbst, his co-prosecutor, in the examination. In addition to his recorded statements in the grand jury room, Kennedy in his role as a prosecutor talked with grand jurors and made remarks that were not made part of the record or transcribed. At the outset of their investigation, he briefed the grand jurors on the general subject matter under investigation. And during the course of the hearings, individual grand jurors approached him asking factual questions

States Attorney Samuel K. Skinner, assures us that Mr. Kennedy will be working under his supervision and that all policy decisions will be made by Mr. Skinner." In view of other evidence in this record, including the fact that although requested to do so by defendants, the

government has not been able to produce the record of any request by the United States Attorney for this district, this court finds that Bingham Kennedy was appointed a Special Attorney in the Department of Justice at the request of his EPA superiors.

which he answered outside the presence of a court reporter.

Sometime in 1977, it was decided that Kennedy would become a witness before the grand jury. Herbst, the co-prosecutor, wanted Kennedy to testify because of his acquired familiarity with the documents which had been received through subpoena and on request. Kennedy's knowledge of EPA procedures, policies, regulations, and statutes made him an ideal witness. The prosecutors wanted a witness who could testify in the final stages of the investigation, fill perceived gaps in the evidence previously presented to the grand jury, and thus justify return of the indictment in the case. Herbst viewed Kennedy's testimony as the substitute for that ordinarily given a grand jury by an investigative case agent.

Other than these considerations, there was no particularized need for Kennedy to appear as a grand jury witness. The decision that he testify was not the result of any exigent circumstance; instead, it was a convenient way by which the prosecutors could place important evidence before the grand jury. It was Herbst, the Assistant United States Attorney in the case, who decided that Kennedy was to assume the role of a witness. Although this course of action was planned over a period of time, neither Kennedy nor Herbst sought or received the approval of a superior in the United States Attorney's office in this district, or one in the Department of Justice. Herbst did not research, or take any step to have anyone else research, the propriety of a prosecutor remaining in that role and appearing as a witness before a grand jury.

Kennedy first appeared as a grand jury witness on November 10, 1977. He testified again on six occasions thereafter. With the exception of his appearance on the afternoon of November 10 and December 1, 1976, he was formally resworn each time he took the stand as a witness. He was reminded on several occasions by Herbst that he was testifying under oath. Between and after his appearances as a sworn witness, Kennedy reappeared before the same grand jury as a prosecutor. Having testified as a witness on November 10, 16, 21 and on the morning of November 30, Kennedy appeared the afternoon of November 30 as a prosecutor and conducted the examination of an important witness. Having returned and testified as a witness on December 1 and 12, 1976, Kennedy resumed his role as a prosecutor to present the indictment to the same grand jurors who had heard him testify under oath.

During the last eight weeks of the grand jury sessions, Kennedy appeared more frequently, and testified at greater length, than any other grand jury witness. His testimony was extensive and touched on substantive aspects of the government's case; it tracked the organization of the indictment which was to be returned. He was asked questions by Herbst that emphasized his personal knowledge of the facts and the importance of his credibility. He gave details that covered each paragraph of the indictment which the government was seeking against the defendants. Under oath, he gave the jury critical background information about the history of federal pesticides regulations, testimony that sought to paint the essentials of, and lend significance to, the studies on heptachlor and chlordane that gave rise to the charges the grand jury was investigating. His testimony touched on the mental state of the individuals whose conduct was under investigation; it covered the areas on which the government predicated its theory for the indictment it was seeking. Kennedy gave his opinion under oath concerning information contained in vital documents, and stated his opinion concerning facts which imputed the state of mind and motive of the individual defendants later named in the indictment proposed by the government. His testimony covered facts and events outside the record before the grand jury. He described under oath the results of his review of EPA files which were not subpoenaed by the grand jury. He swore to the substance of conversations he had with several EPA officials who were not called to testify. Then, on December 12, 1977, he appeared as the last witness; and immediately thereafter, while he remained in the

presence of the grand jurors, Herbst read the indictment which had been prepared by him and Kennedy. The grand jury deliberated between 10 and 20 minutes and voted as a true bill the 11 count indictment that named Velsicol and the six individual defendants and charged three felonies the grand jury had investigated for 18 months.

## II.

From these facts, defendants argue that the indictment in this case must be dismissed because during the deliberations of the grand jury that returned it there was an unauthorized person in the grand jury room. They insist that the Fifth Amendment to the United States Constitution which provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, . . ." guarantees to all persons the protection of a fair and impartial grand jury; that this fairness and impartiality cannot be achieved in the absence of independent, unbiased prosecutors, ones who do not labor under a conflict of interest; that if a prosecutor while presenting the government's case to a grand jury labors under a conflict of interest, he is an unauthorized person in the grand jury room; and his presence there will void any resulting indictment. Defendants contend that Bingham Kennedy had roles that were many and conflicting during the grand jury investigation in this case: he was an EPA staff lawyer, a grand jury case agent, a Special Attorney for the Department of Justice; and he was a witness who before the same grand jury alternated between being a prosecutor and being an important witness. Thus, he labored under a conflict of interest that made him an unauthorized person in the grand jury room, one whose presence there voids the indictment in this case.

Defendants are careful to point out that they do not claim application of a *per se* rule which would bar an agency lawyer from serving as an attorney for the government in the presentation of evidence to a grand jury. They claim, however, that when Kennedy's initial involvement in this criminal investigation is considered in the light of orders given him by superiors within his agency; his involvement before and during the criminal investigation in ongoing administrative proceedings conducted by EPA against the corporate defendant in this case, Velsicol; his participation, directly, indirectly, or peripherally in those administrative proceedings while he was acting as a Special Attorney for the Department of Justice presenting evidence before the grand jury; his personal bias against defendants demonstrated by his efforts to countermand decisions of the United States Attorney for this district; and finally, his role as an important witness who, after testifying, remained in the grand jury room and conducted presentation of the government's case, made him a prosecutor who labored under a conflict of interest that made him an unauthorized person in the grand jury room.

Turning particularly to Kennedy's alternate roles as witness and prosecutor before the same grand jury, defendants contend he violated Rule 6(d), Fed.R.Crim.P., Ethical Consideration 5–9 and Disciplinary Rule 5–101(B) of the American Bar Association's *Code of Professional Responsibility* (1975), and the Association's *Standards, The Prosecution Function* § 3.5(b) (1971), which provides that "[t]he prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury." Therefore, it is defendants' contention that Kennedy not only breached the ethics of his profession; he violated provisions of rules governing criminal procedure in federal courts which prohibited his presence in the grand jury room when he was alternating between being a prosecutor and being an important witness.

Further, defendants claim that the evidence this court heard in support of the motions to dismiss the indictment disclose a totality of grand jury abuse, circumstances which reveal the kind of prosecutorial conduct that seriously undermined the function of the grand jury and violated defendants'

Fifth Amendment guarantees. First, they say that Kennedy and his co-prosecutor Herbst infringed Sixth Amendment guarantees by asking questions of two witnesses which suggested that defendants, then only under investigation, were guilty because Velsicol employed a firm of lawyers who were experienced in the defense of criminal cases. Second, the two prosecutors questioned witnesses in a way that effectively prevented the grand jury from hearing exculpatory evidence. Third, on at least two occasions the secrecy of the grand jury, protected by rules of criminal procedure, was breached. Fourth, Rule 7(c)(1), Fed.R.Crim.P., was violated when the indictment in this case was signed by an attorney for the government before it was returned by the grand jury. Fifth, during pendency of motions to dismiss in this court, and a Freedom of Information Act suit against the EPA in the District of Columbia, Kennedy destroyed evidence that had relevancy to some of defendants' contentions concerning his involvement in EPA administrative proceedings against Velsicol, involvement they say occurred while he was appearing before the grand jury that returned the indictment in this case. For all of these reasons, then, defendants contend that to preserve the integrity of the grand jury system and protect their constitutional rights, this court must dismiss the indictment in this case.

In meeting these contentions and arguments, the government, in the main, does not contest defendants' construction of the facts. Instead, it argues that they mischaracterize many of the events disclosed by the evidence; that defendants draw wrong conclusions about Kennedy's conduct; and that Kennedy was isolated from all of the administrative proceedings conducted at the time he was appearing before the grand jury that returned the indictment in this case. The government's main contention is that reference of the criminal case to the Department of Justice by EPA's General Counsel in July 1975 was done in good faith by lawyers who believed they had uncovered a massive crime that endangered the health and lives of the American people; and that this reference was totally unrelat-

ed to any interest the agency had in its administrative proceedings against Velsicol.

In support of this contention, the government urges that Kennedy, throughout his various roles before the grand jury and in the performance of his duties, acted with propriety, consistent with federal law and rules governing conduct of grand jury investigations. It argues that if there were mistakes by Kennedy and other attorneys for the government, they were made in good faith and do not justify dismissal of this indictment. It says that even as to those instances of prosecutorial conduct which defendants correctly point out were violations of Rule 6(e), Fed.R.Crim.P., or of the ethical canons, defendants were not injured; they cannot complain; and in any event, they do not show grounds that would justify the granting of their motions to dismiss an indictment which was otherwise properly returned by the grand jury.

### III.

#### A.

 Implicit in the Fifth Amendment prohibition that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . ." is the guarantee that a grand jury which presents or indicts will be fair and unbiased. *United States v. Samango,* 450 F.Supp. 1097, 1102 (D.Haw.1978); *United States v. Provenzano,* 440 F.Supp. 561, 564 (S.D.N.Y. 1977); *United States v. DiGrazia,* 213 F.Supp. 232 (N.D.Ill.1963); see *United States v. Dionisio,* 410 U.S. 1, 16–17, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). This guarantee is important to a person under a federal criminal investigation because the purposes of the grand jury are "to provide a fair method for instituting criminal proceedings," *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956), to serve "as a protector of citizens against arbitrary and oppressive governmental action," *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974), and to assure the "pro-

tecting of citizens against unfounded criminal prosecutions." *Branzburg v. Hayes,* 408 U.S. 665, 686, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972). Therefore, these purposes make it necessary that the grand jury be an investigating body "acting independently of either prosecuting attorney or judge," *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960); that it be "independent and informed," *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); and that it perform its mission, which is "to clear the innocent, no less than to bring to trial those who may be guilty." *United States v. Dionisio,* 410 U.S. at 16–17, 93 S.Ct. at 773.

These purposes and the protections they reflect are deeply ingrained in our constitutional history. As a distinguished judge of this court said many years ago, "[t]he Grand Jury exists as an integral part of Anglo-American jurisprudence for the express purpose of assuring that persons will not be charged with crimes simply because of the zeal, malice, partiality or other prejudice of the prosecutor, the government or private persons." *United States v. DiGrazia,* 213 F.Supp. at 235. After saying this, Judge Will admonished us to remember the dissenting words of Mr. Justice Brandeis that "[t]he greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 573, 72 L.Ed. 944 (1928).

■ Consequently, a prosecutor who presents a case to a grand jury has the obligation of preserving the fairness, impartiality, and lack of bias of this important governmental investigative body. He cannot inflame or otherwise improperly influence grand jurors against any person, *United States v. DiGrazia,* 213 F.Supp. at 235; he cannot act in a way that overlooks inherent prejudice to the person under criminal investigation, *United States v. Samango,* 450 F.Supp. 1097; and he must always remember that he "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation

to govern at all . . . ." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

These are indispensable principles; but as one district court said recently, the grand jury's critical task of protecting citizens from arbitrary or unreasonable prosecutions "cannot be achieved in the absence of independent, unbiased prosecutors whose concern for justice transcends all other considerations." *United States v. Dondich,* 460 F.Supp. 849, 855 (N.D.Cal.1978). This is so because prosecutors are vested with large discretion as to matters which are submitted to a grand jury, *United States v. Segelman,* 86 F.Supp. 114, 126 (W.D.Pa. 1949), *aff'd* 212 F.2d 88 (3d Cir. 1954); and it is recognized that a prosecutor "is not merely an advocate. He or she is 'an administrator of justice' as well." *United States v. Andrews,* 444 F.Supp. 1238, 1244 (E.D.Mich.1978); ABA *Standards, The Prosecution Function* § 1.1(b) (1971).

■ Clearly, then, a prosecutor who has a conflict of interest cannot administer justice. For this reason, if he labors under such burdens, he is an unauthorized person in a grand jury room; *State v. Hill,* 88 N.M. 216, 539 P.2d 236 (Ct.App.1975); and the slightest intrusion into a grand jury proceeding by him voids any resulting indictment, even without a showing of prejudice. *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610, 618 (N.D.Okl.1977). However, in any given case, whether a prosecutor before a grand jury labors under a conflict of interest and whether his conduct oversteps the bounds of propriety must be determined by a factual inquiry; there is no *per se* rule that bars a government attorney from serving before a grand jury merely because he is from the agency that originated the criminal charges. *In re Perlin,* 589 F.2d 260, 264 (7th Cir. 1978); see *United States v. Dondich,* 460 F.Supp. 849.

## B.

With this in mind, the court has made the factual inquiry. It has heard evidence which shows that Bingham Kennedy was not an agency lawyer who because of his

knowledge, ability, or expertise, was called to present the government's case to a grand jury. In fact, when he was assigned to monitor EPA's criminal referral concerning Velsicol, Kennedy knew very little about criminal law or procedure; he had only sparse knowledge of the underlying facts which had led to the criminal charges EPA was making. Nonetheless, during the weekend of August 22, 1975, without the benefit of a grand jury, without any investigation by him, but armed only with the letter of referral, a summer extern's memorandum, and some correspondence, he prepared either five or six drafts of an indictment that named Velsicol and five of its employees, four of whom are now defendants in this case. Kennedy alleged that the individuals had committed serious crimes against the United States; and his reason for doing so was the fact that their names appeared in the correspondence he was given.

Then, having obtained Department of Justice authority, Kennedy traveled by plane to Chicago where he presented the papers, including his drafts of the proposed indictment, to the United States Attorney in this district, thus starting the grand jury investigation. A short time later, Kennedy's superiors requested his appointment as a Special Attorney for the Department of Justice so he could officially participate in the investigation. This was done; and on October 8, 1975, he took the oath. Before having done so, however, he became involved in proceedings before the September 1975 Grand Jury. His EPA superiors decided on a target date for return of an indictment against Velsicol and its appropriate employees. This, they thought, should be the end of September 1975; but this date was not met. The investigation continued through the end of 1975 and until June 1, 1976, when a special grand jury was convened. It was this grand jury that completed the investigation and, on December 12, 1977, returned the indictment in this case.

During the eighteen month period the June 1976 Grand Jury carried on its investigation, Kennedy appeared before it as a Special Attorney in about 30 to 40 of its 47 sessions. At the same time, in fact, from inception of his assignment, Kennedy was a staff lawyer whose salary was paid by EPA and whose expenses, including plane trips between Washington, D.C. and Chicago, were borne by the agency. He was a grand jury case agent; and in the final days of the investigation, he alternated his role from that of a prosecutor presenting the government's case to a witness who gave important, material and essential testimony to the grand jury. He was under written orders from the General Counsel of EPA to make reports at least once each week on the progress of the criminal investigation. He complied with this order, and throughout the time he was before the grand jury as a Special Attorney for the Department of Justice, he remained in touch with the administrative proceedings EPA was conducting against Velsicol. He represented the agency in matters related to the proceedings; and he was in contact with his colleagues and associates in the Pesticide Division during the time he was presenting the government's case to the grand jury. He made trips from Chicago to the District of Columbia headquarters of EPA and carried with him cartons of grand jury evidence to an office that was near those occupied by his associates in the Pesticide Division of EPA, associates who were conducting the ongoing administrative proceedings against the corporate defendant who was under criminal investigation here in this district.

When the Administrative Law Judge ruled against EPA in one of the proceedings, it was Kennedy, then presenting evidence before the grand jury, who met with his associates at EPA and formulated the underlying theory that was articulated by EPA's Administrator when, on appeal, he reversed the Administrative Law Judge's decision. Kennedy never told his Department of Justice superiors of his involvement in the EPA administrative proceedings. When he decided to become a witness and alternate his role before the grand jury from prosecutor to witness and back again, he neither reported this to the Department

of Justice nor obtained permission to make this change of roles. His advancement in grade and promotions depended on the commendation and approval he received from his superiors at EPA, to whom he was under orders to report at least once each week.

■ It is generally said that "[t]he term 'conflict of interest' bespeaks a situation in which regard for one duty tends to lead to disregard of another." *United States v. Miller*, 463 F.2d 600, 602 (1st Cir.), *cert. denied*, 409 U.S. 956, 93 S.Ct. 300, 34 L.Ed.2d 225 (1972); *Goitia v. United States*, 409 F.2d 524, 527 (1st Cir. 1969), *cert. denied*, 397 U.S. 906, 90 S.Ct. 896, 25 L.Ed.2d 86 (1970). Thus it is that a lawyer for the Department of Justice who represents the government before a grand jury owes to that department the duty to abide by its rules; he must be loyal to the superiors who direct his presentation of the government's case; he cannot act in a way that will inflame the grand jury against anyone, nor can he engage in conduct that will interfere with the right which every person under investigation has to a fair and unbiased grand jury. However, in this case, Bingham Kennedy, because of his varied roles before the grand jury, was in a situation where regard for the duty he owed his EPA superiors led to disregard of the duties he owed as a Special Attorney for the United States Department of Justice, and to defendants in this case. Two instances best illustrate this fact.[6]

The first one relates to a letter dated July 1, 1976, received by the lawyers for Velsicol and the individuals who were under investigation. It stated that the United States Attorney for this district and his staff had been "engaged in a careful evaluation of the ongoing investigation of the Velsicol Chemical Corporation" and that the purpose of the letter was to communicate the results of that evaluation. The letter said that the investigation was proceeding "with the intention of presenting evidence to the grand jury for the purpose of recommending an indictment against the corporation." Then the fact that individuals were also under investigation was mentioned, naming the persons now defendants in this case; and it concluded that "[a]t this juncture, no decision has been formulated as to the culpability or non-culpability of the above-named subjects."

This letter was written by the United States Attorney, the official responsible for grand jury investigations in this district. It was susceptible to the construction that the United States Attorney had decided on recommending an indictment only against Velsicol, while investigation of the individuals continued. To a lawyer experienced in the defense of criminal charges, this meant that the corporation would have the opportunity to defend the charges against it; and, as a general rule, it is known that if there is exoneration of the corporation, there will be at least a vicarious exoneration of its employees and executives whose conduct may still be under government investigation. And the lawyers who received this letter had the right to assume that when the United States Attorney referred to his staff as having made the evaluation, he was referring to a group of lawyers that included Bingham Kennedy. For these reasons, the letter was an important development to Velsicol and the individuals involved.

Kennedy did not talk to the United States Attorney about this letter. He did not tell him that the grand jury had heard evidence that justified indictment of individuals. He did not communicate with his Department of Justice superiors and complain to them that the United States Attorney in this district was proceeding with indictment of a corporation and leaving unindicted employees and executives in the face of evidence indicating the contrary. Instead, he immediately travelled by plane

---

**6.** There are others. But because this court has made and filed detailed findings of fact, and has reached conclusions of law, this supplementing memorandum will not be extended to include a discussion of the other instances which support defendants' contention that during the time Kennedy appeared before the grand jury he labored under a conflict of interest.

to EPA's headquarters, carrying with him notes of what a letter to the United States Attorney should contain. He spoke to the General Counsel, complaining about the July 1, 1976 letter and expressing concern that if the United States Attorney persisted in the view he had expressed, individual defendants would not be indicted. Kennedy, here too, did not tell the General Counsel that there was evidence justifying indictment of individual defendants; he was only concerned with the fact that proceeding only against Velsicol would go contrary to the policy of EPA expressed to him when we was assigned to monitor the criminal referral concerning Velsicol.

The General Counsel agreed with Kennedy; he consented to the sending of a letter to the United States Attorney; Kennedy, from the notes he had prepared earlier, wrote the letter that was signed by the General Counsel. It reminded the United States Attorney of EPA's interest in the investigation, that its outcome was expected to have a significant impact on the agency's ability to fulfill its regulatory responsibilities, and that it was pleasant to learn that an indictment was going to be sought. However, as to the prosecution of individuals, the letter stated that the matter had been referred to this district on August 29, 1975, and the hope was expressed that a decision on indictment of individuals "can be made in the near future." The United States Attorney was told of a conversation with Assistant Attorney General Richard Thornburgh in which the General Counsel "expressed our view that, in a case of this sort, prosecution of individuals is important to achieve significant deterrent effect. He [Thornburgh] suggested that I write directly to you to express the Agency's viewpoint and suggest that if you were inclined to decide not to prosecute the individual subjects, he would be available to discuss the matter with you and me before any final decision was made." As a direct result of this letter, and another written to the Unit-

ed States Attorney by Peter R. Taft, Assistant Attorney General, Land and Natural Resources Division,[7] the investigation did not proceed to indictment of Velsicol; it continued for another sixteen months when, on December 12, 1977, the indictment in this case was returned charging 11 counts of felonies out of the referrals of misdemeanor accusations EPA had made in July 1975.

The second instance was an order authorizing disclosure to EPA of grand jury evidence which Kennedy and his co-prosecutor Herbst obtained on July 13, 1977 from the Chief Judge of this court. To understand its significance, it must be remembered that although Kennedy had little knowledge of criminal procedure or of the underlying facts that led to the criminal referral concerning Velsicol, he was somewhat familiar with internal EPA administrative procedures. One problem he knew had concerned the agency was evaluation and audit of scientific studies that were the subject of reports to the Administrator of EPA. From his work as an EPA staff lawyer, Kennedy learned that such audits could be made by EPA personnel. Using this knowledge, Kennedy obtained the appointment of two EPA employees as grand jury case agents so they could audit the 18 month mice feeding study that IRDC had conducted for Velsicol. The underlying theory for this audit was the suspicion entertained by Kennedy and Herbst that IRDC's report to Velsicol, the one furnished to the Administrator of EPA, was not truthful.

At this stage of their work, the two prosecutors were exploring the possibility that the criminal investigation had to be expanded to include IRDC, its employees and executives. The audit was completed at IRDC facilities and reported to the grand jury in May 1977. When Kennedy and Herbst studied it, they concluded that the IRDC report which Velsicol had sent to EPA contained shortcomings of which no one in the

7. This letter was dated December 2, 1976. A reading of it shows that either Kennedy or EPA's General Counsel had misinformed Taft about some important aspects of the investiga-

tion. In any event, there is no evidence that the United States Attorney responded either to the letter written for the General Counsel by Kennedy, or to the one written by Taft.

cancellation proceedings was aware. The two prosecutors concluded that "[b]ecause of the obvious and critical importance to the lives and health of the American people of the issue of whether these pesticides [heptachlor and chlordane] cause cancer, we do not believe that the official regulatory decision resolving that issue should be made without having before the appropriate regulatory authorities all of the important facts about the relevant scientific studies." Therefore in an application prepared by Herbst, the United States Attorney asked the Chief Judge for an order authorizing disclosure of the grand jury evidence pursuant to Rule 6(e), Fed.R.Crim.P.[8]

 At this point this court recalls the well-established principle of federal law that proceedings before a grand jury are protected against disclosure by the common law policy of secrecy. This policy is continued in Rule 6(e) which is the measure of the privilege of access to grand jury materials. *In Re Grand Jury Proceedings,* 309 F.2d 440, 443 (3d Cir. 1962). The principle is ancient, see *United States v. Smyth,* 104 F.Supp. 283, 289–90 (N.D.Cal.1952); its object is to protect the good name of innocent persons investigated but not indicted, and thus insure the utmost freedom of the grand jury in its deliberations. It "is not limited to transcripts but encompasses anything that might tend to reveal what transpired in the grand jury room." *United States v. Armco Steel Corp.,* 458 F.Supp. 784, 789 (W.D.Mo.1978). And it is just as well established that the government cannot use in a civil proceeding information derived by or through an examination of records and documents made under authority of the grand jury. *In Re April 1956 Term Grand Jury,* 239 F.2d 263, 272 (7th Cir. 1956); *cf. United States v. Kleen Laundry & Cleaners, Inc.,* 381 F.Supp. 519 (E.D. N.Y.1974).

Here the evidence, which includes the testimony of the two government lawyers, reveals that Kennedy used his knowledge of the ongoing EPA administrative proceeding and persuaded those with whom he worked of the wisdom of obtaining the Rule 6(e) order. From the application and the transcript of the in-chambers hearing before the Chief Judge, it is evident that what Kennedy and Herbst sought to accomplish was use of secret grand jury information in the administrative proceeding. The record before the Chief Judge suggests that he was not acquainted with the technical nature and complexity of the investigation then being conducted by the grand jury. Nonetheless, he asked of Kennedy and Herbst incisive and perceptive questions, none of which were answered in a way that actually told him the real purpose for the application. Kennedy and Herbst believed that the evidence sought to be disclosed had to be known by those conducting the cancellation proceedings before the right administrative adjudication could be made. After expressing doubt concerning propriety of the application, the Chief Judge nonetheless ordered that "pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure, the officials of the Environmental Protection Agency be granted access to copies of documents and transcripts of testimony, presented before the Special 1976 Grand Jury in Cases Nos. 75 GJ 1541 and 76 GJ 2361 presently empaneled in this District which documents and transcripts relate to a May 1977 audit of two carcinogenicity studies on heptachlor and chlordane commissioned by Velsicol Chemical Corporation and conducted by International Research Development Corporation, Mattawan, Michigan."

A few days later, Kennedy journeyed by plane to the District of Columbia and without an appointment went to the chambers of the administrative law judge who was

---

8. By July 13, 1977, the United States Attorney who had written the letter of July 1, 1976 had left the office. A successor United States Attorney had been appointed; but he was not inducted until July 19, 1977. Pursuant to the provisions of 28 U.S.C. § 546, this court appointed Charles P. Kocoras to serve as the United States Attorney until the vacancy was filled. It was Kocoras who signed the application for the Rule 6(e) order prepared by Herbst and presented to the Chief Judge by him and Kennedy.

hearing the cancellation proceedings and there delivered to him the grand jury materials. Kennedy had with him a letter written to the judge by Herbst inviting further communication on the matter. The administrative law judge was not a person included in the phrase "officials of the Environmental Protection Agency" contained in the disclosure order. Administrative law judges are hearing examiners, 5 U.S.C. § 3105; the law creating their office contemplates that they be independent of pressure from agencies whose cases they pass upon. *Federal Trial Examiners Conference v. Ramspeck,* 104 F.Supp. 734, 737 (D.D.C.), *aff'd,* 91 U.S.App.D.C. 164, 202 F.2d 312 (1952), *rev'd and remanded on other grounds,* 345 U.S. 128, 73 S.Ct. 570, 97 L.Ed. 872 (1953). Therefore, Kennedy's delivery of the grand jury materials to the administrative law judge did not comply with the disclosure order issued by the Chief Judge of this court; and it violated Rule 6(e) because the purpose of that delivery was to enable its use in an ongoing administrative proceeding and influence its outcome.

■ Thus it is evident that as an EPA staff lawyer, Kennedy's regard for the duty he owed to the agency and the duty he felt to his EPA superiors, led him to disregard the duties he owed as a Special Attorney to the United States Department of Justice, to the grand jury in protecting the secrecy of its proceedings, and to the defendants in this case as to their rights secured by the Constitution of the United States. In attempting to perform his various roles, he was a lawyer who labored under a conflict of interests; because of this fact, Kennedy was a person who was unauthorized to be in the grand jury room.

### C.

■ There is another reason, perhaps a more important one, why Kennedy was an unauthorized person in the grand jury room in this case. Without permission from a superior, he changed his grand jury role as a Special Attorney for the Department of Justice to that of a witness who, although a lawyer, put his credibility on the line and gave important, extensive, and essential testimony. Then he alternated the role of witness with that of a prosecutor, remaining in the grand jury room after he had testified. The role of a witness was one he could not properly play. *United States v. Dondich,* 460 F.Supp. at 858. An attorney for the government who acts both as a lawyer and as a witness engages in conduct that is contrary to Ethical Consideration 5–9 and Disciplinary Rule 5–101(B) of the ABA *Code of Professional Responsibility* (1975), prohibitions to which government attorneys have been made subject by 28 C.F.R. § 45.735 1(b) and by this court's supervisory authority. See *United States v. Armedo-Sarmiento,* 545 F.2d 785 (2d Cir. 1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977); *United States v. Torres,* 503 F.2d 1120 (2d Cir. 1974).

■ Section 3.5(b) of the *Standards, The Prosecution Function,* adopted by the American Bar Association, provides that a "prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury." Rule 6(d), F.R.Crim.P., prohibits the presence of more than one witness in the grand jury room at the same time. Therefore when Kennedy, the witness who had testified, remained in the grand jury room as Kennedy the prosecutor to interrogate a witness, he violated the ABA's *Code of Professional Responsibility* and its *Standards* relating to the prosecution function, as well as Rule 6(d). See *United States v. Bowdach,* 324 F.Supp. 123 (S.D.Fla.1971); *United States v. Edgerton,* 80 F. 374 (D.Mont. 1897). His dual roles aggravated the fact that he was an unauthorized person in the grand jury room. *United States v. Treadway,* 445 F.Supp. 959 (N.D.Tex.1978); *Latham v. United States,* 226 F. 420 (5th Cir. 1915); *Paroutian v. United States,* 297 F.Supp. 137, 139 (E.D.N.Y.1968). This fact establishes a *per se* ground for dismissal of the indictment in this case, even without a showing of prejudice. *United States v. Treadway,* 445 F.Supp. 959; *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610;

accord, *United States v. Daneals,* 370 F.Supp. 1289 (W.D.N.Y.1974).

### D.

As is usual in a case like this one, defendants point to other instances of prosecutor conduct as grounds for dismissal of this indictment. In a motion in which they allege a totality of grand jury abuse by government attorneys, defendants incorporate by reference their contentions concerning Kennedy's roles in this investigation, and have added others. This court, *sua sponte,* has elected to treat two dismissal grounds alleged by defendants in separate motions because in its judgment they deserve discussion in deciding whether the evidence discloses a totality of prosecutor conduct which deprived defendants of a fair and unbiased grand jury. And in resolving this issue, the court may consider as aggravating circumstances matters which alone might, as a matter of law or in a particular case, be inadequate. *United States v. Samango,* 450 F.Supp. at 1102. Therefore, the following are the aggravating circumstances in this case.

### 1.

During the interrogation of two witnesses, one the president of Velsicol's parent corporation, another a corporate executive, questions were asked them and comments were made by the prosecutors, in the presence of the grand jurors, which carried adverse and incriminatory inferences from the fact that, in the EPA administrative proceeding and during the grand jury investigation, Velsicol employed a firm of attorneys that had a nationwide reputation as defense lawyers in criminal cases. The questions and the comments plainly suggested that Velsicol, its executives and employees believed themselves guilty of crimes; and for that reason, the particular law firm was employed.

 It is not to be doubted that Velsicol had the constitutional right to employ counsel of its choice in the administrative proceedings, and certainly to be advised with regard to the criminal investigation, even though exercise of this right is not absolute where grand juries are involved. See *In Re Gopman,* 531 F.2d 262 (5th Cir. 1976); *In Re Grand Jury,* 446 F.Supp. 1132 (N.D.Tex.1978). It is improper, where a right is constitutional, for a prosecutor either to question or comment on its exercise. *United States v. Vargas,* 583 F.2d 380, 388 (7th Cir. 1978). To do so is to make assertion of the right costly. See *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *United States ex rel. Macon v. Yeager,* 476 F.2d 613 (3d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973). For this reason, in a criminal law context, it is basically unfair for a prosecutor to urge against a person the time and circumstances of his retention of an attorney. See *United States v. Liddy,* 166 U.S.App.D.C. 95, 111, 509 F.2d 428, 444 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975).

### 2.

 The prosecutors in this case selectively questioned witnesses and kept certain information in their possession, thus withholding exculpatory evidence from the grand jury. There were at least three such instances.

One occurred when Dr. John Rust was subpoenaed to appear before the grand jury. In an interview with Kennedy and Herbst before he began his testimony, Dr. Rust asked for an opportunity to tell the grand jury that he had undergone a change of mind concerning the examination of the IRDC slides, which he reported to Velsicol in December 1972. He wanted to tell the grand jurors why he had changed his views concerning the importance of his report. Kennedy told Dr. Rust that he talked too much; and that when he testified before the grand jury, he was to answer only questions asked of him. An examination of the grand jury proceedings the day Dr. Rust testified discloses that he was never asked questions which gave him the opportunity to explain his change of views concerning the report he had furnished to Velsicol, one of three that gave rise to the criminal investigation in this case.

Another instance was the refusal of the prosecutors to explore before the grand jury a report of an advisory committee of the National Academy of Sciences concerning slide readings of the IRDC study. Defendants consider the substance of this report supportive of the position they have taken in this case. This evidence was not presented to the grand jury in a way that would have disclosed its exculpatory nature.

The third instance was the failure or refusal of the prosecutors to tell the grand jury that in 1973, EPA had in its possession a report by its own chief pathologist which appears to have adequately advised the Administrator of EPA of the potential carcinogenicity of heptachlor and chlordane, information more authentic than the report of the scientists which is now claimed to have been withheld from EPA.

It is true that a prosecutor is vested with large discretion as to matters being submitted to a grand jury, *United States v. Segelman,* 86 F.Supp. at 126, but he is under legal and ethical obligations to present evidence which is exculpatory of persons under investigation, since the grand jury cannot protect citizens from malicious prosecutions if it is not given information which is material to its determination. *United States v. DeMarco,* 401 F.Supp. 505, 513 (C.D.Cal.1975), *aff'd,* 550 F.2d 1224 (9th Cir.), *cert. denied,* 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977); see ABA *Standards, The Prosecution Function* § 3.6(b). When a prosecutor refuses to present exculpatory evidence, he, in effect, destroys the existence of an independent and informed grand jury. As this court has already said, the constitutional guarantee that no person shall be held to answer for a capital or otherwise infamous crime, unless on the presentment or indictment of a grand jury, presupposes an investigative body acting independently of either the prosecuting attorney or the judge. *United States v. Dionisio,* 410 U.S. at 16, 93 S.Ct. 764; *United States v. Provenzano,* 440 F.Supp. at 564.

As witnesses in these proceedings, Kennedy and Herbst admitted knowing of these three instances. They insist, however, that in their judgment Dr. Rust's change of view concerning his December 1972 report was not relevant or material; that the report of the National Academy of Sciences was of little value to the grand jury; and that Dr. Reuber's 1973 report concerning the carcinogenicity of heptachlor and chlordane had little or no value in determining whether defendants should be indicted. However, in view of the other aspects of this criminal investigation, the court finds it difficult to accept this rather glib explanation. It holds that the prosecutors in this case withheld exculpatory evidence from the grand jury; and that, as a consequence, their conduct taints the indictment before it. *United States v. Phillips Petroleum Co.,* 435 F.Supp. at 618.

### 3.

The government admits that in October 1975 Bingham Kennedy communicated secret grand jury information, without court authorization to Jeffery Howard, an EPA staff attorney who was then in charge of the administrative proceedings against Velsicol. Nonetheless, it argues that what Kennedy told Howard was in general terms; that no document was furnished him; and that the identity of Velsicol employees involved in the grand jury information was not disclosed. Defendants, however, argue that this instance, which the government revealed because it could not be secreted, was not the only breach of Rule 6(e) committed by Kennedy while he served as a Special Attorney before the grand jury.

They point out that in July 1977 he transmitted a memorandum based on secret grand jury material to the General Counsel of EPA in violation of the rule. This court has discussed at length the July 13, 1977 order which Kennedy, along with Herbst, obtained *ex parte* from the Chief Judge of this court in order to influence the ongoing EPA administrative proceedings against Velsicol. Defendants point to Kennedy's admitted practice of transporting cartons of grand jury evidence to his EPA office in the District of Columbia and, at times, to

his home in Virginia, all in violation of Rule 6(e). To round out the instances, defendants ask the court to recall the fact that on September 12, 1975, when Kennedy was neither an agent of the grand jury nor an attorney for the government, he obtained and reviewed secret grand jury documents. These instances, defendants argue, were all violations of Rule 6(e). See *In Re Grand Jury Proceedings,* 309 F.2d 440 (3d Cir. 1962); *In Re Grand Jury Investigation,* 414 F.Supp. 74 (S.D.N.Y.1976). The record, in this court's judgment, supports defendants' contentions.

### 4.

■ The indictment in this case was signed by an attorney for the government before it was returned by the grand jury; in fact, while the government's case was still being presented. When, at the conclusion of the evidentiary hearing of defendants' motions to dismiss, this became known, the court referred the parties to *United States v. Tedesco,* 441 F.Supp. 1336 (M.D.Pa.1977), and ordered the government to set forth in affidavit form the details surrounding the signing and return of the indictment. This has been done by the filing of two affidavits.

One is by Sanford Sagalkin, Deputy Assistant Attorney General for Land and Natural Resources of the United States Department of Justice. In it he says that in late November 1977 he was authorized to assume overall supervisory responsibility for the grand jury investigation in this case; that in order to evaluate it, he met for several hours with attorneys representing the subjects of the investigation, for several hours with the prosecutors handling the investigation, and with other Department of Justice personnel. He said he spent a substantial amount of time reflecting about the matter, made an evaluation, and "decided to recommend to the grand jury that Velsicol Chemical Corporation and six individuals be indicted. I personally signed the indictment in this matter at the Department of Justice headquarters at Washington, D. C. I do not recall the date upon which I did so."

The other is by Joseph Conley, who states under oath that since 1974 he has been in charge of coordinating the assembly and movement of grand juries in this district; that during the time he has discharged these responsibilities, the original of proposed indictments is kept by a clerk-secretary in the office of the United States Attorney until after a true bill is voted by the grand jury; and that after this occurs, he carries it to the clerk-secretary and receives the original from her, together with other documents; and that when he receives the original proposed indictment from the clerk-secretary, "it bears the signature of the United States Attorney or other representative of the Department of Justice." Apparently, Conley's affidavit was furnished because Herbst, who on December 12, 1977 read the proposed indictment to the grand jury, could not swear that the signed copy of it was not left with the foreman before the grand jury began its deliberations.

Obviously, these affidavits raise more questions than they answer. Sagalkin's focuses attention on the possibility that he signed the original while the grand jury was still hearing evidence. Its cavalier tone saying that it was he who "decided to recommend to the grand jury that Velsicol Chemical Corporation and six individuals be indicted" brings into question the respective roles of the grand jury and the government attorney in the indictment process. Conley's affidavit leaves open the possibility that, in this case, the copy of the indictments signed by Sagalkin was in fact left with the foreman before the grand jury began its deliberations.

Rule 7(c)(1), Fed.R.Crim.P., requires that "[t]he indictment . . . . shall be signed by the attorney for the government." This signature performs the function of attesting to the action of the grand jury. *Crowley v. United States,* 194 U.S. 461, 475, 24 S.Ct. 731, 48 L.Ed. 1075 (1904); see *United States v. Cox,* 342 F.2d 167, 171 (5th Cir.), *cert. denied,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). Its execution

is intended to show that the attorney for the government joins with the grand jury in instituting the proceeding, *Little v. United States,* 524 F.2d 335, 336 (8th Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 326 (1976); one that begins after the indictment is found and returned. *Quinlan v. United States,* 22 F.2d 95, 97 (5th Cir. 1927). And as to its importance, it must be remembered that "[t]he very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States,* 361 U.S. at 218, 80 S.Ct. at 273.

In this case, the questions left unanswered by the Sagalkin and Conley affidavits and Herbst's inability or unwillingness to swear that the signed copy of the proposed indictment was not shown to the grand jurors before they began their deliberations compel this court to conclude that the signed copy was shown, or in some way made known, to the grand jurors before they voted the true bill. This fact perhaps explains why a grand jury that heard evidence for eighteen months took only 10 to 20 minutes to deliberate concerning an eleven count indictment which charged a corporation and six individuals with three serious felonies, all named in some counts, all or some of them in others. This kind of conduct by government attorneys makes a mockery of the grand jury system.

### 5.

To round out this catalog, the government admits that after the indictment in this case, and only a few weeks after it assured this court that Kennedy had no involvement in the EPA proceeding against Velsicol, he destroyed the draft of a letter to an assistant to the president of the National Academy of Sciences who, on May 7, 1976, informed the administrative law judge hearing the case that "recently the Academy was informally approached by officials of EPA regarding the imminent possibility of referral of questions in the hepta-

chlor/chlordane cancellation proceeding. . . ." This draft either would have identified Kennedy as one of the officials of EPA who had approached the Academy or it would have made it clear he was not. In addition, Kennedy destroyed a typed receipt acknowledging custody of a portion of an EPA report, and some handwritten notes regarding communications with current and former EPA employees. The government defends Kennedy with the claim that he acted reasonably and in good faith; and that, in any event, the destroyed materials would not have supported any of defendants' theories in this case.

The court will not extend this memorandum to resolve these contentions. It is sufficient for it to say that Kennedy had notice of defendants' requests for information concerning his involvement in the administrative proceeding on behalf of EPA while he was a Special Attorney for the Department of Justice presenting the government's case to the grand jury. Not only had they invoked the rules of criminal discovery; Velsicol filed an Freedom of Information Act suit in the District of Columbia which EPA was preparing to answer with information that had to be furnished by Kennedy. Certainly the destroyed materials were not personal notes, and thus exempted from production in the District of Columbia suit, see *Porter County Chapter v. United States Atomic Energy Commission,* 380 F.Supp. 630 (N.D.Ind.1974); and this court was never asked to determine whether the destroyed materials had to be produced in this criminal case. It appears, then, that Kennedy judged the matter, destroyed materials which may have been evidence in this case, and thus denied defendants access to important information in a situation which ordinarily would justify imposition of sanctions. See *United States v. Carrasco,* 537 F.2d 372 (9th Cir. 1976); *United States v. Morell,* 524 F.2d 550 (2d Cir. 1975); *United States v. Hilton,* 521 F.2d 164 (2d Cir. 1975), *cert. denied,* 425 U.S. 939, 96 S.Ct. 1674, 48 L.Ed.2d 131 (1976); see also *United States v. Benlizar,* 459 F.Supp. 614 (D.D.C. 1978). These circumstances, revealing as they are, disclose a totality of grand jury

abuse by government attorneys. They demonstrate a series of prosecutor conduct which in its cumulative effect undermined the grand jury process and deprived defendants of their constitutional right to a fair and unbiased grand jury.

### IV.

Therefore, it is the court's conclusion that the evidence adduced requires dismissal of this indictment. The indictment was returned by a grand jury that had an attorney before it, presenting the government's case while laboring under conflicts of interest. It heard a government attorney who alternated his role as a prosecutor with that of an important witness, and then remained in the presence of the grand jury. This attorney was a person who was not authorized to be in the grand jury room; his presence there voids the indictment in this case, even without a showing of prejudice. *United States v. Treadway,* 445 F.Supp. 959; see *United States v. Dondich,* 460 F.Supp. at 858. Moreover, and firming the balance toward dismissal of this indictment, the evidence shows a totality of grand jury abuse by government attorneys, circumstances of prosecutor conduct that undermined the grand jury, destroyed its independence, and deprived defendants of their Fifth Amendment rights. See *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610; *United States v. Braniff Airways, Inc.,* D.C., 428 F.Supp. 579. For these reasons, an appropriate dismissal order will be entered.