**UNITED STATES of America, Plaintiff,**

v.

**William L. HART, Defendant.**

**No. 91–80136.**

United States District Court,
E.D. Michigan, S.D.

Nov. 21, 1991.

Stephen J. Markman, U.S. Atty., by Alan M. Gershel, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

Norman L. Lippitt, Birmingham, Mich., Thomas W. Crammer, Bloomfield Hills, Mich., for defendant.

## OPINION AND ORDER RE: DEFENDANT'S MOTION FOR DISMISSAL OF INDICTMENT "BASED ON SPECIAL ASSISTANT UNITED STATES ATTORNEY PATRICK FOLEY'S MANIFEST AND IRRECONCILABLE CONFLICT OF INTEREST IN THE GRAND JURY PROCEEDINGS"

GADOLA, District Judge.

Defendant William L. Hart, who was, on the dates alleged in the indictment herein, Chief of the Police Department of the City of Detroit, is accused, in a seven count indictment, of:

1. conspiracy to embezzle or wrongfully convert public funds (18 U.S.C. § 371);

2. embezzlement/wrongful conversion of public funds (18 U.S.C. § 666);

3. embezzlement/theft of public funds (18 U.S.C. § 666);

4. obstruction of justice by tampering with a witness (18 U.S.C. § 1512(b)(1));

5. making and subscribing a false 1985 income tax return (26 U.S.C. § 7206(1));

6. making and subscribing a false 1986 income tax return (26 U.S.C. § 7206(1));

7. making and subscribing a false 1987 income tax return (26 U.S.C. § 7206(1)).

He has moved for dismissal of the indictment "based on Special Assistant United States Attorney Patrick Foley's manifest and irreconcilable conflict of interest in the grand jury proceedings and in this case...."

This court, at the request and on the motion of the defendant, has conducted extensive evidentiary hearings at which the defense has submitted both testimony from various witnesses and other evidence in support of the aforesaid motion for dismissal of the indictment.

It is the contention of the defendant that since Patrick Foley, an Assistant Prosecuting Attorney for Wayne County, Michigan, who assisted the Detroit Police Department, in his role as Assistant Prosecuting Attorney, in its internal investigation of possible wrongful embezzlements or conversions of funds from the police department's Secret Service Fund, and became contemporaneously involved, as a Special Assistant U.S. Attorney, in the federal grand jury investigation of the same matters, and Chief Hart's possible involvement therein, engaged thereby "in a manifest and irreconcilable conflict of interest." The defense further contends that Foley's "participation in this case creates an overwhelming appearance of impropriety and destroys the mandatory perception of disinterestedness which must surround every prosecutor," and that "[t]his blatant conflict of interest mandates dismissal of the indictment against Chief Hart." Further, defendant urges that "this conflict also renders Foley's appearance before the grand jury unauthorized, tainting the indictment and also mandating its dismissal."

Defendant's position is summarized in his brief submitted in support of his motion as follows:

"Attorney Foley has been employed by the Wayne County Prosecutor's Office ("WCPO") for nearly two decades as a prosecuting attorney and investigative agent. In the various capacities he assumed as an Assistant Wayne County Prosecutor prior to this investigation, Attorney Foley had been intimately involved with Chief Hart, the Detroit Police Department ("DPD"), and the Detroit Police Department Special Imprest Cash Fund ("Fund"). Indeed, Attorney Foley became a trusted partner of Chief Hart and the DPD in the fight against crime. As a consequence, Attorney Fo-

ley has been privy to internal DPD confidential and secret information, including that which forms the predicate for, and core of, this prosecution. Attorney Foley's appointment as a Special Assistant U.S. Attorney has allowed the Government to improperly and unlawfully exploit Attorney Foley's confidential and secret information in its investigation of Chief Hart.

Attorney Foley's sudden transformation from a trusted confidant of Chief Hart and the DPD into the aggressive prosecutor of Chief Hart creates a manifest conflict of interest, an overwhelming appearance of impropriety, and destroys the mandatory aura of disinterestedness which must accompany all prosecutions. Moreover, because of this manifest conflict of interest, Attorney Foley's participation in the Grand Jury proceedings were unauthorized under the Federal Rules of Criminal Procedure and applicable case law. Accordingly, Chief Hart respectfully submits that this Court must dismiss the Government's indictment."

### Background Facts

In November of 1989 John D. O'Hair, Prosecuting Attorney of Wayne County, was approached by Chief Hart, Executive Deputy Chief James Bannon, and James Ardary, a legal advisor to the police department, and was informed that the Detroit Police Department, at the instance of Chief Hart, had initiated an investigation of possible defalcations from the department's Secret Service Fund by one Kenneth Weiner, a civilian Third Deputy Chief of the Detroit Police Department.

At that meeting Mr. O'Hair inquired as to whether the investigation would be focused on any other persons, alluding to Chief Hart himself, since there had been suggestions in the media that he was involved. O'Hair was told that the focus of the investigation was principally, if not exclusively, on Weiner. Among other media speculation, which led to Prosecutor O'Hair's inquiry and concern, there had, for instance, appeared various articles indicating that Chief Hart might have been involved in improprieties, including reports that rent on Hart's daughter's apartment in California had been paid for a considerable time by Weiner or Weiner's corporations.

At that same meeting Prosecutor O'Hair stated to all present that "any investigation conducted by the Detroit Police Department of its own high-command officers without the assistance of an outside independent investigative agency would have little credibility in the eyes of the public and that the public perception would simply be the one which I shared: you cannot investigate your own; you cannot investigate yourself. Executive Deputy Chief James Bannon was offended by the suggestion—insulted. I think those were his words: 'I am offended; I am insulted. The Detroit Police Department can investigate its own,' and that's where pretty much it ended."

Independently, Mr. O'Hair had previously discussed with the Director of the Michigan State Police the possibility of that agency being involved in an investigation of irregularities regarding Detroit Police Department funds, and obtained his consent to having the State Police become involved in such an investigation. O'Hair had made a similar inquiry to Robert Bowman, then State Treasurer, and had obtained a similar response with regard to obtaining the assistance of the State of Michigan in investigating financial aspects of the suspect transactions.

Subsequently, Prosecutor O'Hair designated Assistant Prosecuting Attorney Patrick Foley, Chief of the Organized Crime Section of the Wayne County Prosecutor's Office, as the individual from his office who would assist the Detroit Police Department in its internal investigation and who would specifically review the department's applications and requests for search warrants with regard to such internal investigations. It appears that Mr. Foley also was generally authorized to advise and assist the Detroit Police Department's investigators in the conduct of their internal investigation.

Meanwhile, the U.S. Attorney for the Eastern District of Michigan had initiated a federal investigation of these same alleged misappropriations of Detroit Police Department funds. The federal investigation, however, extended beyond Kenneth Weiner and was exploring the possible involvement of other persons. An agreement was reached between Prosecutor O'Hair and U.S. Attorney Stephen Markman that a member of O'Hair's staff be appointed as a Special Assistant U.S. Attorney in order to coordinate efforts of the Wayne County Prosecutor's Office and the U.S. Attorney's Office in investigations of possible criminal diversion of Detroit Police Department funds. Mr. O'Hair recommended Patrick Foley for this position and he was in due course, after the usual background investigation, appointed on January 10, 1990 to this position by the United States Department of Justice. Thus, an agreement was reached that there be a joint investigation by the U.S. Attorney and the Wayne County Prosecutor. Thereafter, for a period of time Foley both served the federal investigation as a Special Assistant U.S. Attorney and also assisted the Detroit Police Department personnel in their investigation of the funds allegedly converted wrongfully from the police department's secret service fund. As stated, the federal investigation was more wide-ranging than that of the Detroit Police Department, which was focused, so it would appear, entirely on Weiner.

It is apparent from the evidence that the federal investigation and the Detroit Police Department internal investigation were separate, rather than joint investigations. It is also apparent that Mr. Foley's participation in the federal investigation was well known to the Detroit Police Department's investigators.

It is equally clear from the evidence that the Wayne County Prosecutor, as chief law enforcement officer of Wayne County, had an interest in conducting an investigation of possible corruption in the Detroit Police Department and indeed had a legal duty to pursue such an investigation, and therefore did have an interest in coordinating his efforts with those of the U.S. Attorney. He therefore designated Mr. Foley to assist

in the federal investigation. In fact, it was Mr. O'Hair who approached the U.S. Attorney and emphasized his position that the prosecutor had to have a role in the matter as the county's chief law enforcement officer, and that it was preferable to unite his efforts with those of the U.S. Attorney rather than to have duplicate investigative efforts, and therefore to have one single joint investigation by the Wayne County prosecutor and the U.S. Attorney.

Mr. O'Hair designated Mr. Foley, and Mr. O'Hair specifically requested that he be appointed as a Special Assistant U.S. Attorney, in order that the county prosecutor and the U.S. Attorney might have a "partnership" in the investigation, and with the prosecutor having a truly meaningful role therein. O'Hair described the joint investigation as a "limited partnership" in which Mr. Markman, as U.S. Attorney, would be the "captain" or "general partner" and with Mr. O'Hair being a "limited partner".

Mr. O'Hair testified that he designated and selected Mr. Foley to be his representative in the joint investigation because of Foley's experience and expertise as chief of the prosecutor's Organized Crime Unit and head of the Organized Crime Task Force.

Also, testimony established that the Wayne County Prosecutor regularly and customarily, as a matter of course, assisted some 43 police agencies in Wayne County, with the Detroit Police Department being one of those agencies, and, on repeated occasions, despite those relationships, was called upon to investigate and to prosecute wrongdoers who were members of those police agencies. Those investigations and those prosecutions were undertaken and pursued against members of the police force of the Detroit Police Department on various occasions, despite the fact that the prosecutor worked with and assisted that police agency, and 42 others, in their investigations.

In his status as Wayne County Assistant Prosecuting Attorney, Mr. Foley, with regard to this investigation, periodically met with Detroit Police Department investiga-

tors and reviewed their requests and applications for issuance of search warrants, including those pertaining to a proposed search of the residence of Christine Stephens, who was a civilian Third Deputy Chief of the police department.

Foley continued to advise and assist the Detroit Police Department's internal investigation until late March or early April 1990 and met with their investigators from 8 to 15 times, with such meetings involving the matter of applications for search warrants. Foley, on occasion, drafted for the Detroit Police Department investigators their affidavits for issuance of search warrants. At the time that Foley was assisting the Detroit Police Department investigators in their internal investigation by reviewing their applications for search warrants and drafting affidavits for those warrants, the federal grand jury investigation, in which he was also involved, had begun to focus on the activities of Chief Hart, his involvement with Weiner, and with Weiner's various dummy corporations.

At one of Foley's meetings with Detroit Police Department investigators they exhibited to him certain charts and summaries which they had prepared from bank records of Weiner and his corporations, showing cash flow into Weiner's corporations from Detroit Police Department funds, and out of the corporations' bank accounts. Subsequently the federal grand jury, which was being assisted by Mr. Foley, subpoenaed those same bank records and the charts and summaries from the Detroit Police Department.

Mr. Foley testified, however, that federal investigators had already developed the same information concerning these cash transactions and cash flow.

It appears that Mr. Foley interrogated before the grand jury, in his capacity as Special Assistant U.S. Attorney, at least one witness from whom evidence had been obtained through a search warrant based upon an application and affidavit prepared for Detroit Police Department investigators by Mr. Foley, in his capacity as Assistant Prosecuting Attorney, to assist the police department's internal investigation.

It is apparent from the testimony that the Detroit Police Department investigators were well aware, while they were working with Mr. Foley, that he was at the same time serving as a Special Assistant U.S. Attorney and working with the federal grand jury, which was also investigating the possible embezzlement or conversion of Detroit Police Department funds by Weiner and, possibly, others.

Ultimately, the federal grand jury attempted to obtain, by subpoena, information procured by the Detroit Police Department's internal investigation, but the Detroit Police Department refused to turn over the data.

Several Detroit Police Department officers have testified in the evidentiary hearings held herein that when they appeared as subpoenaed witnesses before the grand jury, they were subjected to hostile, belligerent and badgering interrogation by Foley, and that Foley in fact suggested to them during his interrogation that they were being evasive or untruthful.

It is the contention of defendant Hart that the aforesaid participation of Mr. Foley as a Special Assistant U.S. Attorney in the federal grand jury proceedings investigating the misappropriation of Detroit Police Department funds, while at the same time assisting in advising the Detroit Police Department's internal investigation, as an Assistant Prosecuting Attorney for Wayne County, in obtaining search warrants and reviewing with police department investigators the information upon which they were basing their request for search warrants, created "a manifest and irreconcilable conflict of interest."

It is the further contention of the defendant that Foley's participation in the grand jury proceedings, while engaging in a conflict of interest, rendered him an unauthorized person in the grand jury room. For these reasons, it is the position of Chief Hart that dismissal of the grand jury indictment is mandated.

### Conclusions of Law

Defendant places great reliance on the original holding in *In re April 1977 Grand*

*Jury Subpoenas*, 573 F.2d 936 (6th Cir. 1978) in which it was held that the Attorney General's appointment of an Internal Revenue Service lawyer to conduct a grand jury investigation of an auto manufacturer concerning alleged income tax evasion was unethical under the American Bar Association Code of Professional Responsibility, since there was an appearance of impropriety by reason of the IRS lawyer's prior connection with an IRS investigation of the manufacturer's income tax returns and the IRS recommendation in which he participated as to the need for a grand jury investigation.

The Court of Appeals stated that "[t]he final question is whether Piliaris, on ethical grounds, was disqualified to conduct proceedings before the grand jury as a special attorney for the government while remaining on the payroll of IRS...." *Id.* at 941. In that case an IRS lawyer, while acting exclusively for the IRS, wrote a letter to the Department of Justice recommending a grand jury investigation of General Motors Corporation. The lawyer, in that letter, stated that at the appropriate time, after conclusion of a grand jury investigation, IRS would request a court order authorizing the disclosure of grand jury information to IRS under the provisions of Rule 6(e) of the Fed.R.Crim.P. This same IRS attorney was then appointed as a Special Assistant U.S. Attorney to handle the grand jury investigation. Shortly prior to his appointment as Special Assistant U.S. Attorney he wrote a memorandum describing an IRS meeting which he attended, at which was planned the conduct of the IRS' own handling of the General Motors matter in coordination with the proposed grand jury investigation. Some IRS employees were to be assigned to the grand jury investigation, and the IRS, so it was planned, would defer General Motors' request for a civil tax ruling pending the grand jury investigation. Thus, while the Department of Justice attorneys were interested only in the criminal aspects of the case, IRS was interested only in the civil aspects and in using the grand jury materials, gathered by its attorney who had been appointed as a Special Assistant U.S. Attor-

ney, in order to collect taxes and civil penalties. Thus, the IRS was, so it was held, using criminal procedures to elicit evidence in a civil case, contrary to the ruling in *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958). As the Sixth Circuit Court of Appeals observed, it should not be necessary for the IRS to conduct, through its own attorney, a grand jury investigation in order to obtain evidence for its use in civil cases, and that while there was nothing unlawful in the appointment of the IRS attorney to conduct the grand jury investigation, this involved the *appearance* of a conflict of interest, and that the court must act with scrupulous care to avoid any *appearance* of impropriety. As the court stated "[i]t is fundamental that both unfairness and the appearance of unfairness should be avoided. Wherever there may be reasonable suspicion of unfairness, it is best to disqualify." It must, however, be emphasized that this decision of the Sixth Circuit Court of Appeals bears little resemblance factually to the case at bar. Also, whatever authority this case may be for the position of the defendant herein is diminished by the subsequent *en banc* ruling vacating this decision. *See* 584 F.2d 1366 (6th Cir.1978), *en banc*. Although the basis for the *en banc* ruling was not a repudiation of the ruling of the majority of the three judge panel in its original decision as set forth in 573 F.2d 936, nevertheless that original ruling was set aside.

■ Defendant also cites, and places substantial reliance on, the decision in *Perillo v. Advisory Committee on Professional Ethics*, 83 N.J. 366, 416 A.2d 801 (1980). In that matter the question posed was whether it is proper for a municipal prosecutor or any other member of a municipal law department to represent the interests of the municipality against those of its employees, particularly its police officers, in municipal court actions and departmental hearings, such as civil service or disciplinary proceedings at the local level, as well as in subsequent appeals of such matters before state administrative agencies and the courts. *Id.*, 416 A.2d at 803. The

court in *Perillo* held, 416 A.2d at 803 as follows: "[w]e now hold that a municipal attorney cannot undertake to represent the municipality or its interests in any administrative or judicial proceedings against municipal employees where, because the attorney has had regular and frequent contact with such employees in the course of handling municipal business, a person generally familiar with the affairs of the municipality could reasonably believe that an attorney in such a position would be subject to and hindered by a professional conflict of interest. Our holding is based substantially upon the appearance of ethical impropriety which ... is nevertheless a basic ethical concept." The Court, 416 A.2d at 806, quoting in part from Opinions of the New Jersey Supreme Court's Advisory Committee on Professional Ethics, stated that:

"[t]he public would have the tendency to believe that the municipal prosecutor would be less than zealous in his prosecution of a municipal police officer." *Opinion* 394, *supra*, 101 N.J.L.J. at 417, 432. It may be that in many municipal settings, it is generally felt that municipal prosecutors and police officers act together on a regular basis and are thus functionally on the "same team" in the discharge of their official duties. Such close working relationships would understandably foster the public belief that, in an adversary prosecution of a municipal police officer by a municipal attorney, there might well be an actual or subconscious temptation for the attorney to compromise the public interest. The real possibility that the attorney's professional vigor on behalf of the municipality might be weakened, even subconsciously, by his familiarity with the charged police officer cannot be discounted.

A perception by the public of divided allegiance and diminished professional commitment on the part of the attorney, whether accurate or not, would be normal and entirely reasonable where a municipal attorney has worked closely with the police on a regular basis. This kind of situation thus impermissibly generates in a later adversarial proceeding against the police officer the appearance of impropriety with respect to the municipal attorney. "We agree that the 'appearance' of impropriety must be something more than a fanciful possibility. It must have some reasonable basis ... [and], where as here, a reasonable basis is shown to exist, 'appearance' alone may be sufficient to present an ethical problem even though no actual impropriety exists."

This case thus involved only the question of whether a municipal attorney, who represents the municipality itself and has regular and close relationships and contacts with municipal police officers and has worked closely with them on a regular basis, can ethically represent the municipality in an adversarial, administrative or judicial proceeding directed against a police officer employed by that same municipality. The obvious dichotomy between that situation and that existing in the case at bar is that it is clear that at no time did Mr. Foley represent Chief Hart or the Detroit Police Department. He was never an attorney representing the municipality, or any of its departments or personnel. He was, as was well known to the Detroit Police Department investigators, an Assistant Prosecuting Attorney for Wayne County, representing not the police department, but rather the people of Wayne County, and, as Special Assistant U.S. Attorney, the government of the United States. He owed no allegiance to Chief Hart, to officers of the Detroit Police Department, to the Detroit Police Department itself, or to the City of Detroit, a municipal corporation.

In *U.S. v. Gold*, 470 F.Supp. 1336 (N.D.Ill.E.D.1979) it was held that a prosecutor who displays a conflict of interest constitutes an unauthorized person in the grand jury room and the slightest intrusion into the grand jury proceedings by him voids any resulting indictment even without a showing of prejudice. Further, it was held that in a given case, whether the prosecutor before the grand jury labors under the conflict of interest and whether his conduct oversteps bounds of propriety must be determined by factual inquiry, and

there is no per se rule that bars a government attorney from serving before the grand jury merely because he is from the agency which originated criminal charges. In this case it was held that a government attorney labored under a conflict of interest which made him an unauthorized person in the grand jury room and one whose presence voided the indictment handed down by the grand jury against a pesticide manufacturer and its officials, where in such proceedings he acted as Environmental Protection Agency staff lawyer, grand jury case agent, Special Attorney for the Department of Justice, and as an important grand jury witness. The court concluded in *Gold* that where a staff member of the Environmental Protection Agency, who also served as a Special Attorney for the Department of Justice presenting the government's case to the grand jury in an effort to obtain an indictment against the pesticide manufacturer and its officers, testified before the grand jury as a witness and then remained in the grand jury room as a prosecutor to interrogate another witness, by so doing he violated provisions of the American Bar Association's Code of Professional Responsibility and Section 3.5(b) of its Standards of the Prosecution Function relating to the prosecution function, and the principle of secrecy of grand jury proceedings under Rule 6(d) of the Federal Rules of Criminal Procedure. It is certainly not surprising that, implementing the factual inquiry mandated by the court in *Gold,* the court found that there was an unavoidable and inexcusable conflict of interest. The EPA lawyer demonstrated his disregard of the duties he owed to the Department of Justice as a Special Assistant U.S. Attorney and his primary regard for the duty he felt to his EPA superiors by improperly transmitting grand jury materials to an Administrative Law Judge on behalf of his employer, the EPA. As the court said in *Gold:*

> ... [t]hus it is evident that as an EPA staff lawyer, Kennedy's regard for the duty he owed to the agency and the duty he felt to his EPA superiors, led him to disregard the duties he owed as a Special Attorney to the United States Department of Justice, to the grand jury in protecting the secrecy, and to the defendants in this case as to their rights secured by the Constitution of the United States. In attempting to perform his various roles, he was a lawyer who labored under a conflict of interest; because of this fact, Kennedy was a person who was unauthorized to be in the grand jury room.
>
> There is another reason, perhaps a more important one, why Kennedy was an unauthorized person in the grand jury room in this case. Without permission from his superior, he changed his grand jury role as a Special Attorney for the Department of Justice to that of a witness who, although a lawyer, put his credibility on the line and gave important, extensive and essential testimony, then he alternated the role of witness with that of a prosecutor, remaining in the grand jury room after he had testified. The role of a witness was one he could not properly play. An attorney for the government who acts both as a lawyer and as a witness engages in conduct that is contrary to Ethical Consideration 5-9 and Disciplinary Rule 5-101(B) of the ABA Code of Professional Responsibility (1975), prohibition as to which government attorneys have been made subject by 28 C.F.R. § 45.7351(b) and by this court's supervisory authority.... Therefore, when Kennedy, the witness who had testified remained in the grand jury room as Kennedy the prosecutor to interrogate a witness, he violated the ABA's Code of Professional Responsibility and its Standards relating to the prosecution function as well as Rule 6(d). His dual roles aggravated the fact that he was an unauthorized person in the grand jury room. This fact establishes a *per se* ground for dismissal of the indictment in this case even without a showing of prejudice.

*Id.* at 1351.

It would of course be difficult indeed to justify the conduct of the EPA lawyer in *Gold* but that conduct was remote indeed from that of Mr. Foley in the case at bar.

In *U.S. v. Braniff Airways, Inc.*, 428 F.Supp. 579 (W.D.Tex.1977), also cited by the defendant, it was held that an attorney who was a former chief of the Civil Aeronautics Board ("CAB") was ethically barred from accepting employment with the Anti–Trust Division of the Department of Justice and from accepting assignments to conduct grand jury proceedings in a case concerning the same matters he had considered and decided at the CAB, and on which he had recommended official decisions to the CAB. He was held to be ineligible to participate in the grand jury proceeding in any capacity, that he was an unauthorized person before the grand jury, and therefore his appearance in the grand jury room, so it was held, vitiated the indictment.

Again, this situation seems to have been an egregious example of reprehensible prosecutorial misconduct before a grand jury and bears virtually no resemblance to the conduct of Mr. Foley.

Defendant also relies upon *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) in which a plurality of the Supreme Court held that a federal court's appointment of counsel for a party that was the beneficiary of a court order in a civil suit, to undertake criminal contempt prosecution for alleged violations of that order, was improper. There was no majority opinion in the case so holding, and even if this plurality opinion were construed to be controlling authority, it is a factual situation which again is quite remote from that in which Mr. Foley was involved.

See also to the same effect as the plurality decision in *Young v. U.S., supra*, the holding in *Polo Fashions, Inc. v. Stock Buyers, Int'l Inc.*, 760 F.2d 698 (6th Cir. 1985). The court in *Polo* held, at page 704, that it was an abuse of discretion for the district court to appoint attorneys for *Polo* to conduct the criminal contempt proceedings. It is noteworthy, however, that it was held that those attorneys could assist the United States Attorney or an Assistant, but could not proceed alone. At page 705 in *Polo* is found the following language:

"[w]here counsel for an interested party is appointed pursuant to Rule 42(b) he or she cannot conduct the criminal contempt proceedings, but may assist the United States Attorney or the Assistant United States Attorney assigned to the prosecution. If the United States Attorney should decline to prosecute upon request, then the district court may appoint one or more disinterested attorneys to do so. In that event, again, counsel for an interested party may be appointed to assist. However, in this circuit an attorney for a party in underlying litigation may not conduct criminal contempt proceedings as sole or primary counsel." Thus, it was held by the Court of Appeals for the Sixth Circuit in its decision in *Polo Fashions* that while an attorney for the party in underlying litigation could not subsequently conduct criminal contempt proceedings as sole or primary counsel, that attorney could indeed assist the United States Attorney in the criminal contempt proceedings.

The majority opinion in *Young v. U.S., supra*, embraced this concept of assistance by interested attorneys, so-called. See *Young, supra*, 481 U.S. at 806, 107 S.Ct. at 2137 (n. 17). It appears that the practice has become well accepted in the wake of *Young*.

From a practical standpoint, a blanket application of the rule in *Young* to government attorneys does not comport with the basic rationale of *Young*. The Ninth Circuit has commented that *Young* "appears largely to have been concerned with conflicting financial interests." *F.T.C. v. American Nat'l Cellular*, 868 F.2d 315, 319 (9th Cir.1989). Thus, the Supreme Court did not intend *Young* to "disqualify automatically any F.T.C. attorney as 'interested' simply by virtue of employment with the agency that brought the underlying suit." Instead, the court should focus on "the involvement of the U.S. Attorney's office" and "the extent of the particular (government) attorneys' involvement in the underlying civil litigation obviously is relevant in assessing the propriety of (government attorneys') participation as special prosecutors." *Id.* at 320.

In the case at bar, the prosecution has been controlled and directed by the office of the United States Attorney, as "general partner", not by Special Assistant U.S. Attorney Foley, who is an assistant to Prosecuting Attorney O'Hair, the "limited partner".

The Fourth Circuit approved the extensive involvement of civil rights lawyer, Morris Dees, in a criminal contempt proceeding against a leader of the Ku Klux Klan in *Person v. Miller*, 854 F.2d 656 (4th Cir.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989), despite the federal government's "belated" approval of Dees' participation. *Id.* at 662–664. As the *Person* court explained:

> We ... read *Young* at least implicitly to approve (or certainly not to forbid) the practice of allowing private counsel for interested parties to participate formally with government counsel in the prosecution of contempt citations so long as that participation (1) has been approved by government counsel; (2) consists solely of rendering assistance in a subordinate role to government counsel; and (3) does not rise in practice to the level of effective control of the prosecution.

*Id.* at 663. Here, in the case at bar, as in *Person*, the federal government has given express authorization for Special Assistant Foley to participate in this case. Special Assistant Foley's role has been, so the record clearly establishes, limited to rendering assistance by examining witnesses and aiding in trial preparation. Other Assistant United States Attorneys have been and will be "in actual control of the prosecution—both formally and in practical effect." Thus, even if it be assumed arguendo that Special Assistant Foley is an "interested" prosecutor, his involvement in the case would not appear to be contrary to the rule in *Young*. *See Id.* at 663–664; *see also F.T.C. v. American Nat'l Cellular, supra.*

The ruling, cited by defendant, in *United States v. Fulmer*, 722 F.2d 1192 (5th Cir. 1983) was to the effect that while dismissal of an indictment by reason of an unauthorized person being present in the grand jury proceedings, in violation of Fed. R.Crim.P. 6(d), was justified, that dismissal would be without prejudice to the government's right to attempt to reindict the defendant unless it had been shown that governmental misconduct or gross negligence in prosecuting the case had actually prejudiced the defendant. This decision will only impact on Chief Hart's situation in the event that there is a determination that Mr. Foley was not authorized to be involved in the grand jury proceedings. In the event of such a determination, and if this court deemed dismissal of the indictment to be appropriate, then and only then would this court be faced with a determination of whether the dismissal should be with or without prejudice.

In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), cited by the government, it was held that where an error has not so compromised the structural protections of the grand jury as to render the proceedings fundamentally unfair, a federal district court may not dismiss an indictment for error in grand jury proceedings unless such error prejudiced the defendant. The court further held that where dismissal of an indictment is sought for non-constitutional error, the standard of prejudice which militates in favor of dismissal of the indictment is appropriate only if (1) the violation substantially influenced the grand jury's decision to indict, or (2) there is grave doubt that the decision to indict was free from the substantial influence of such decisions. In that case, the appearance of two unauthorized IRS agents before the grand jury, for the purpose of reading transcripts for the grand jury in tandem was held to constitute a violation of Rule 6(d) of the Fed.R.Crim.P.; nevertheless, the Supreme Court said that this non-constitutional error did not meet the standard of prejudice which required dismissal of the indictment.

There were also various other errors committed by the government in its conduct in the grand jury proceedings in *Bank of Nova Scotia, supra.* Nevertheless, the Supreme Court held that even in light of such errors and violations by the govern-

ment in the grand jury proceedings: "dismissal of the indictment is only appropriate if it is established that the violations substantially influenced the grand jury's decision to indict, or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." 487 U.S. at 256, 108 S.Ct. at 2374, 101 L.Ed.2d at 238, citing *U.S. v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986). Thus, the Supreme Court held that despite errors by the government at the grand jury proceedings, the indictment would not be dismissed absent a showing of manifest prejudice to the defendant. See also *Dick v. Scroggy*, 882 F.2d 192 (6th Cir.1989) and *In the Matter of Grand Jury Subpoena of Rochon*, 873 F.2d 170 (7th Cir.1989).

In *U.S. v. Troutman*, 814 F.2d 1428 (10th Cir.1987) it was held that the action of the New Mexico Attorney General in assisting Special Assistant U.S. Attorneys in the prosecution of a state official for extortion under the Hobbs Act did not represent a conflict of interest. It was held that the defendant, a state official, was not entitled to dismissal of the indictment on the basis of such an alleged conflict of interest by the state Attorney General. The state official, defendant in the criminal proceedings, argued that he enjoyed an attorney/client relationship with the state Attorney General because the Attorney General represented him, as a state official, in his daily business affairs in the conduct of his official duties. The Tenth Circuit Court of Appeals held, however, that the Attorney General acted properly in assisting in the federal prosecution of this official misconduct because he also had an affirmative, statutorily defined duty to prosecute all criminal actions when, in his judgment, it was in the best interests of the state to do so. Further, it was held that the actions of the Attorney General of New Mexico in acting as a prosecutor before the federal grand jury created no inherent conflict of interest since the Attorney General would defend actions against a state officer only when the course of action arose while the officer was acting in his official capacity, and that the acts alleged in the indictment were unlawful personal acts not encompassed by Troutman's official duties. The court further held that no inherent conflict of interest existed merely because the Attorney General had advised Troutman, in Troutman's official capacity on matters unrelated to the offenses charged, and instead related to the performance of his official duties. The holding in *Troutman, supra,* is significant in that the fact situation there involved was considerably stronger from the defendant's point of view from that which exists in this case, and yet the ruling went against the defendant. In contrast to the situation in *Troutman*, e.g., the Wayne County Prosecutor had no responsibility to represent the City of Detroit, the Detroit Police Department or Chief Hart, even in performance of their official duties. As was the case in *Troutman*, even if it is argued that the Wayne County Prosecutor was somehow representing Chief Hart, which is a dubious proposition to say the least, and one which this court cannot accept, it could not in any event be urged with candor and credibility that such representation could conceivably extend to the actions of Chief Hart which are alleged to be in violation and disregard of his official duties, and which alleged actions would be inimical to the interests of the Detroit Police Department, as well as those of the public, and were allegedly for his personal financial gain. If the actions of the Attorney General of New Mexico in *Troutman*, in assisting and participating in the federal prosecution of a state official who was represented by the same Attorney General, in the performance of his official duties, did not represent a conflict of interest on the part of the Attorney General mandating dismissal of the federal indictment, then it is difficult indeed to conclude that Mr. Foley's conduct could represent such a "manifest and irreconcilable conflict of interest." This court finds the reasoning of the Court of Appeals of the Tenth Circuit to be not only significant, but indeed persuasive and compelling. It is of course clear that Mr. Foley was duly appointed as Special Assistant U.S. Attorney in this matter, and his presence and participation in the grand jury proceedings is

therefore facially appropriate under the provisions of Fed.R.Crim.P. 6(d). The only basis, then, on which his presence in the grand jury proceedings can be challenged, is the argument, advanced by defendant herein, that he is disqualified by his alleged conflict of interest in also acting, in his capacity as an Assistant Prosecuting Attorney of Wayne County, as an adviser to the Detroit Police Department's internal investigators.

In *United States v. Mechanik, supra,* the government committed a violation of Rule 6(d) of the Fed.R.Crim.P. by permitting unauthorized persons to be present during grand jury proceedings. Nevertheless, the Supreme Court held that such error did not require automatic reversal of a subsequent conviction in the absence of any showing of prejudice, ruling that there is no reason not to apply to such cases the provision of Rule 52(a) of the Federal Rules of Criminal Procedure to the effect that errors not affecting substantial rights shall be disregarded. Justice Rehnquist wrote in his opinion, joined by four justices, and with Justices O'Connor, Brennan and Blackmun concurring in a separate opinion, "[w]e cannot accept the Court of Appeals' view that a violation of Rule 6(d) requires automatic reversal of a subsequent conviction regardless of the lack of prejudice. Fed.R.Crim.P. 52(a) provides that errors not affecting substantial rights shall be disregarded. We see no reason not to apply this provision to 'errors, defects, irregularities or variances' occurring before a grand jury just as we have applied it to such error occurring in the criminal trial itself." *Id.* at 57.

It thus appears to this court that the most persuasive, and the controlling, authority is to the effect that even if it is deemed that an error is committed by the government in permitting an unauthorized person (in defendant's view this would be Mr. Foley) to be present before the grand jury, in violation of Rule 6(d), nevertheless this would not mandate dismissal of the indictment absent a manifest showing of resultant prejudice to the defendant.

## *Holding*

It cannot be seriously argued that Assistant Wayne County Prosecuting Attorney Foley represented the City of Detroit, the Detroit Police Department or Chief Hart. In his capacity as a representative of Prosecutor O'Hair, he reviewed applications for search warrants brought to him by personnel of the Detroit Police Department who were conducting an internal investigation of the misappropriation of funds from the police department's secret service fund, and assisted in the preparation of affidavits for such search warrants. In such capacity, Mr. Foley was a representative of Mr. O'Hair, the chief law enforcement officer of Wayne County, and therefore represented the people of Wayne County rather than the City of Detroit, a municipal corporation, the Detroit Police Department or Chief Hart. It is of some significance that the police department and/or Chief Hart seemed to have had Mr. Andary involved in this internal investigation, as their legal advisor.

True, Mr. Foley was at the same time acting as a Special Assistant U.S. Attorney and in such capacity was assisting in the federal grand jury investigation relating to the suspected criminal diversion of funds from the Detroit Police Department by Mr. Weiner and possibly others, but this court is unable to fathom in what manner this could be construed to create a conflict of interest. If indeed Mr. Foley was serving as a legal advisor to protect the interests of the police department, or of individuals serving the police department, or of Chief Hart, in a criminal investigation, then it would seem that a viable case would exist for the proposition that there was a conflict of interest on his part. But in the extant circumstances, he was assisting the Detroit Police Department in an investigation of misappropriation of public funds, and at the same time was assisting the Department of Justice in its concomitant investigation of the same matter. How, it may rhetorically be asked, could Chief Hart or any Detroit Police Department investigator construe Mr. Foley's role and responsibility in each investigation to be other than to attempt to determine whether crimes had

been committed and to determine the possible perpetrators? Could the Detroit Police Department investigators expect that Mr. Foley would confine himself, in his role in their investigation, to the obtaining of evidence against Kenneth Weiner only, and would ignore evidence pointing to any other persons possibly being involved in Weiner's criminal activities? The questions, of course, answer themselves.

In fact, if Mr. Foley were to confine himself, in his role as an Assistant Prosecuting Attorney aiding the Detroit Police Department's internal investigation, only to an investigation of Mr. Weiner, while disregarding the possible criminal involvement of the chief of the department in the same matter, his actions would be in disregard and derogation of his duties and responsibilities as a prosecuting attorney.

It is indeed more than a little disheartening and sobering that the Detroit Police Department's investigators apparently had no interest in investigating anyone other than Weiner, bitterly resented Prosecutor O'Hair's suggestions and entreaties that the police department should not attempt to investigate itself, and seemed to have resisted the more far reaching federal investigation, and in fact refused to respond to grand jury subpoenas for information obtained by their personnel in conducting their investigation of defalcations from the department's Secret Service Fund. Their reaction to the grand jury's request for information, their apparent bitter resentment of the conduct of any investigation other than their own internal investigation, as expressed by Executive Deputy Chief James Bannon, the indignation of their officials regarding the fact that they were subjected to aggressive interrogation by Mr. Foley in the grand jury, all are indicative that they desired no investigation other than that of Mr. Weiner. Nevertheless, they had no right to assume, and could not reasonably have assumed, that Mr. Foley, known by them to be a Special Assistant U.S. Attorney in the federal government's investigation of this matter, as well as Chief of the Organized Crime Section of the Wayne County Prosecutor's office, owed any duty of representation or loyalty to the Detroit Police Department's personnel, Chief of Police Hart, or to the City of Detroit as a legal entity.

The record is clear that the Detroit Police Department investigators were fully aware, when they discussed their evidence and search warrant requests with Mr. Foley, that he was acting as a Special Assistant U.S. Attorney in the federal investigation. If they anticipated that he would take no note whatsoever of those matters in performing his function for the federal investigation, when it was well known that Prosecutor O'Hair and U.S. Attorney Markman were conducting a joint investigation of the embezzlement or conversion of public funds from the Detroit Police Department's Secret Service Fund, despite his responsibilities both to the people of Wayne County and to the government of the United States, this would be truly both remarkable and amazingly and unbelievably naive. For the police department, its investigators and the defendant to urge that this court should accept this proposition does suggest a high degree of disingenuousness on their part. Mr. Foley contends that the matters which he reviewed with the Detroit Police Department investigators, being primarily evidence of the cash flow from Detroit Police Department funds to the bank accounts of Weiner's various corporations, and from those corporate bank accounts to other parties, and charts showing these cash flows, and matters relating to a proposed search of the residence of Christine Stephens, a Third Deputy Chief of the Detroit Police Department, were already known to the federal investigators. The defendant produced no evidence to refute Foley's contentions, but even if he had, the use of such information by Foley in the federal investigation would not be improper conduct by him, and would not demonstrate any conflict of interest on his part, inasmuch as he at no time represented the City of Detroit, the Detroit Police Department or Chief Hart, but rather acted in the interest of the public, as a representative of John O'Hair, the prosecuting attorney and chief law enforcement officer of Wayne County, in reviewing requests for search warrants made by the Detroit Police Department's internal investigators.

Defendant produced as witness various ranking officers of the Detroit Police Department, who had participated in the department's internal investigation, and who were subsequently subpoenaed by the federal grand jury as witnesses and were interrogated there by Mr. Foley. These witnesses testified to their outrage at the aggressive tactics of Foley in interrogating them and to their distress at their impression that he may have disbelieved some of their testimony. It is not readily apparent to this court how this would demonstrate any conflict of interest on the part of Foley since his loyalties were owed not to them but rather to the public and to the public interest. Rather, the interrogation would seem to be the tactic or style of Foley as an examiner of witnesses. Certainly these officials of the Detroit Police Department should not have, as professional police officers, taken umbrage at the fact that they were aggressively questioned rather than being gently interrogated and treated as with "kid gloves". In any event, evidence of such aggressive questioning by Foley would not appear to have any bearing whatsoever on the issues herein, and does not demonstrate any conflict of interest on the part of Foley, who was a prosecutor and a law enforcement officer, rather than legal counsel to the City of Detroit, the Detroit Police Department, or Chief Hart.

It is also noteworthy, and more than a little disturbing, that the Detroit Police Department's investigators adamantly resisted grand jury subpoenas for production of the bank records which they had obtained and the cash flow charts which they had produced, and refused to produce the same. This would appear to confirm somewhat Prosecutor O'Hair's observation that the Detroit Police Department should not have investigated itself. Again, this court is satisfied that Mr. Foley was fulfilling his duties and responsibilities both as a Wayne County Prosecutor and as a Special Assistant U.S. Attorney in pursuing the federal grand jury investigation of these matters, and doing so despite the apparent intransigence and obduracy of the Detroit Police Department, which seemed to resist any investigative procedure which went beyond Kenneth Weiner and reached into the police department itself. As this court has determined, and has stated herein repeatedly, Foley owed no duty of representation to the City of Detroit, the Detroit Police Department or Chief Hart, and this had to have been well known to the Detroit Police Department's investigators, who were advised that he was acting as a Special Assistant U.S. Attorney in the federal investigation. His duty, as was their duty, was to assist in uncovering evidence of crime, wherever that evidence should lead. It is only regrettable that there is at least an appearance that the Detroit Police Department's investigators did not share Mr. Foley's determination to pursue the evidence wherever it might lead.

There has been no evidence produced by the defendant tending to establish that there was any conflict of interest between Foley's actions as an Assistant Wayne County Prosecutor and his actions as a Special Assistant U.S. Attorney pursuing a joint Wayne County and federal investigation of the misappropriation of Detroit Police Department funds. This then must result in a ruling that Mr. Foley's participation in the grand jury proceedings was not in violation of Rule 6(d) but rather was entirely proper.

Even in the event, however, that Mr. Foley's participation in the grand jury proceedings was deemed to somehow constitute a conflict of interest on his part, nevertheless the defendant has adduced no evidence whatsoever of any resultant prejudice to defendant Hart. As case authority previously cited confirms, such a showing of prejudice is essential in order for any conflict of interest to result in a nullification of the indictment.

Accordingly, the motion of the defendant for dismissal of the indictment herein must be denied.

### Order

The motion of defendant Hart for dismissal of the indictment herein is hereby DENIED.